# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52450-3-II |
| Respondent, | |
| v. | PART PUBLISHED OPINION |
| ALAN DALE JENKS, | |
| Appellant. | |

MAXA, C.J. – Alan Jenks appeals his conviction of first degree robbery, his sentence as a persistent offender to life in prison without the possibility of release under the Persistent Offender Accountability Act (POAA), RCW 9.94A.570, and the imposition of certain legal financial obligations (LFOs). The conviction arose from the robbery of a convenience store in Spokane. Jenks was sentenced as a persistent offender based on prior convictions of second degree robbery and first degree robbery.

When Jenks committed the current offense and when he was sentenced, former RCW 9.94A.030(32)(o) (2012) (now RCW 9.94A.030(33)) classified second degree robbery as a "most serious offense," which meant that Jenks's prior second degree robbery conviction was a strike offense under the POAA. But while this appeal was pending, the legislature in 2019 amended RCW 9.94A.030(33) to remove second degree robbery from the list of offenses that

qualify as a strike offense. LAWS OF 2019, ch. 187 § 1. Jenks argues that the current version of RCW 9.94A.030(33) applies on appeal, and therefore his sentence as a persistent offender must be vacated.

We hold that the 2019 amendment to RCW 9.94A.030(33) removing second degree robbery from the list of offenses that qualify as strike offenses under the POAA does not apply to invalidate Jenks's sentence. In the unpublished portion of this opinion, we address and reject Jenks's remaining arguments regarding his conviction and sentence. However, we hold that the criminal filing fee and DNA collection fee imposed as LFOs must be reconsidered in light of the 2018 amendments to the LFO statutes.

Accordingly, we affirm Jenks's conviction and sentence to life in prison without the possibility of release, but we remand for the trial court to consider imposition of the criminal filing fee and DNA collection fee under the currently applicable statutes.

FACTS

A jury found Jenks guilty of first degree robbery that occurred on December 8, 2014. Sentencing took place on June 22, 2017. The State presented certified copies of the judgment and sentence for Jenks's 2004 conviction of second degree robbery and his 2011 conviction for first degree robbery.

The trial court found that Jenks's current conviction was a "most serious offense" and that Jenks had been convicted on two separate occasions of most serious felonies. Clerk's Papers (CP) at 113. The court further found that Jenks's prior first degree robbery and second degree robbery convictions required that he be sentenced as a persistent offender under RCW 9.94A.570. As a result, the court sentenced Jenks to a term of life in prison without the possibility of release. Jenks appeals his sentence.

ANALYSIS

Jenks argues that the 2019 amendment to RCW 9.94A.030(33) that removed second degree robbery from the list of offenses that qualify as strike offenses under the POAA should be applied on appeal to invalidate his sentence as a persistent offender to life in prison without the possibility of release. We disagree.

A.    DEFINITION OF "MOST SERIOUS OFFENSE"

Under RCW 9.94A.570, a "persistent offender" must be sentenced to total confinement for life without the possibility of release. RCW 9.94A.030(38)(a)[1] defines "persistent offender" to include someone who has been convicted of a "most serious offense" and who previously has been convicted at least two separate times for most serious offenses. RCW 9.94A.030(33) defines "most serious offense" to include all class A felonies and a number of other listed felonies.

In 2014, when Jenks committed the offense for which he was convicted and from which he appeals, former RCW 9.94A.030(32)(o) included second degree robbery on the list of most serious offenses. The trial court sentenced Jenks as a persistent offender in 2017 based in part on his prior second degree robbery conviction under this statute.

But in 2019, the legislature amended RCW 9.94A.030(33) by removing second degree robbery from that list. LAWS OF 2019, ch. 187, § 1. This amendment became effective on July 28, 2019. LAWS OF 2019, at ii.

---

[1] At the time Jenks committed the offense at issue here, this definition was contained in former RCW 9.94A.030(37)(a) (2012).

B.    EFFECT OF 2019 AMENDMENT TO RCW 9.94A.030(33)

The question here is whether we must review Jenks's sentence under the law in effect at the time Jenks committed his current offense or under the law in effect at the time we decide his appeal.  We conclude that RCW 9.94A.345 and RCW 10.01.040 both require Jenks to be sentenced under the law in effect when he committed the offense.

1.    Legal Principles

The general rule is that a defendant's sentence is determined based on the law in effect at the time the defendant committed the crime for which he is being sentenced.  *State v. Medina*, 180 Wn.2d 282, 287, 324 P.3d 682 (2014); *State v. Ross*, 152 Wn.2d 220, 236-37, 95 P.3d 1225 (2004).  This rule derives from two sources: (1) RCW 9.94A.345, a provision of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW; and (2) RCW 10.01.040, the general saving statute.

First, RCW 9.94A.345 states, "Any sentence imposed under this chapter [the SRA] shall be determined in accordance with the law in effect when the current offense was committed." The POAA is part of the SRA.  *See* RCW 9.94A.570; *State v. Knippling*, 166 Wn.2d 93, 98, 206 P.3d 332 (2009).  Based on RCW 9.94A.345, the Supreme Court repeatedly has stated that "a defendant must be sentenced in accordance with the law in effect at the time of his or her offense." *Medina*, 180 Wn.2d at 287; *see also In re Pers. Restraint of Carrier*, 173 Wn.2d 791, 809, 272 P.3d 209 (2012); *State v. Varga*, 151 Wn.2d 179, 191, 86 P.3d 139 (2004).

Second, RCW 10.01.040, the general saving statute, states:

No offense committed and *no penalty or forfeiture incurred* previous to the time when any statutory provision shall be repealed, whether such repeal be express or implied, shall be affected by such repeal, unless a contrary intention is expressly declared in the repealing act . . . .  Whenever any criminal or penal statute shall be amended or repealed, all offenses committed or *penalties or forfeitures incurred* while it was in force shall be punished or enforced as if it were in force,

notwithstanding such amendment or repeal, unless a contrary intention is expressly declared in the amendatory or repealing act, and every such amendatory or repealing statute shall be so construed as to save all criminal and penal proceedings, and proceedings to recover forfeitures, pending at the time of its enactment, unless a contrary intention is expressly declared therein.

(Emphasis added.) Under the saving statute, "courts must sentence a defendant in accordance with the law in effect on the date he or she committed the crime." *Ross*, 152 Wn.2d at 236-37.

Here, it is undisputed that former RCW 9.94A.030(32)(o) – listing second degree robbery as a most serious offense – was in effect at the time Jenks committed his current offense. And the 2019 amendment did not express an intent that it would apply to pending prosecutions for offenses committed before its effective date. Therefore, both RCW 9.94A.345 and RCW 10.01.040 require that Jenks be sentenced based on the former version of RCW 9.94A.030(33) rather than based on the 2019 amendment to RCW 9.94A.030(33) unless those statutes are inapplicable or some exception applies under the facts of this case.

2.    Jenks's Attempts to Avoid RCW 9.94A.345 and RCW 10.01.040

Jenks makes several arguments in an attempt to avoid application of the rule established by RCW 9.94A.345 and RCW 10.01.040. We reject these arguments.

a.    Effect of Pending Appeal under *Ramirez*

Jenks argues that *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018), establishes that the 2019 amendment to RCW 9.94A.030(33) applies to his sentence because the amendment became effective while his case was pending on direct appeal. We disagree.

In *Ramirez*, the Supreme Court addressed whether the 2018 legislative amendments to the LFO statutes applied to a case pending on direct appeal. 191 Wn.2d at 747-49. The court held that the amendments to the LFO statutes applied prospectively to Ramirez because they

"pertain to costs imposed on criminal defendants following conviction, and Ramirez's case was pending on direct review and thus not final when the amendments were enacted." *Id.* at 747.

The defendant in *Ramirez* appealed the trial court's imposition of discretionary LFOs, arguing that the court had failed to make an adequate inquiry into his ability to pay. *Id.* at 736-37. The Supreme Court concluded that the trial court had erred in imposing the LFOs without an adequate inquiry, which normally would have entitled the defendant to resentencing. *Id.* at 746. However, while the appeal was pending the legislature enacted amendments to the LFO statures that prohibited the imposition of discretionary LFOs and the criminal filing fee on indigent defendants. *Id.* The defendant argued that these amendments applied to his appeal, and therefore the Supreme Court should strike the LFOs because he was indigent rather than remanding for resentencing. *Id.*

The court relied on *State v. Blank*, 131 Wn.2d 230, 249, 930 P.2d 1213 (1997), which applied a statute imposing appellate costs on defendants prospectively to cases on appeal when the statute was enacted. *Ramirez*, 191 Wn.2d at 748. The court stated that as in *Blank*, the 2018 LFO amendments "concern the court's ability to impose costs on a criminal defendant following conviction" and Ramirez's case was on appeal as a matter of right when the amendments became effective. *Id.* at 749. The court concluded that "[b]ecause [the LFO] amendments pertain to costs imposed upon conviction and Ramirez's case was not yet final when the amendments were enacted, Ramirez is entitled to benefit from this statutory change." *Id.*

Jenks suggests that *Ramirez* adapted a rule of prospective application of statutory amendments to all sentences in cases pending on direct appeal. However, the court in *Ramirez* clearly limited its holding to "costs imposed on criminal defendants following conviction." *Id.* at 747. The court did not state a rule of general application to all sentences. Further, the court did

not discuss or even reference RCW 9.94A.345 or RCW 10.01.040. This omission demonstrates that the court was adopting a rule that applied only to LFOs.

We conclude that *Ramirez* does not support Jenks's argument that the 2019 amendment to RCW 9.94A.030(33) must be applied prospectively to his sentence.

      b.    *Heath* and *Wiley*

Jenks argues that under *State v. Heath*, 85 Wn.2d 196, 532 P.2d 621 (1975), and *State v. Wiley*, 124 Wn.2d 679, 880 P.2d 983 (1994), a legislative reduction in the penalty for a crime must be applied retroactively. We disagree.

In *Heath*, the defendant was found to be a habitual traffic offender and his license to drive was revoked under the Habitual Traffic Offenders Act, RCW 46.65.060. 85 Wn.2d at 197. A year later, the Act was amended to allow a revocation order to be stayed if the offenses were the result of alcoholism. *Id.* The trial court then stayed the revocation order based on the amendment. *Id.* The Supreme Court held that the amendment applied retroactively because it essentially reduced the penalty for a crime. *Id.* at 198. "When this is so, the legislature is presumed to have determined that the new penalty is adequate and that no purpose would be served by imposing the older, harsher one." *Id.*

However, we conclude that the rule stated in *Heath* is inapplicable here. First, *Heath* is a civil case, not a criminal case, and did not involve a criminal sentence. Second, the Supreme Court in *Ross* subsequently stated that *Heath* did not implicate RCW 10.01.040 because *Heath* involved a civil driver's license revocation. *Ross*, 152 Wn.2d at 239. And other courts have noted that *Heath* is not controlling regarding the retroactivity of sentencing statutes because the court did not address the effect of RCW 10.01.040. *State v. Toney*, 103 Wn. App. 862, 865, 14 P.3d 826 (2000); *State v. Kane*, 101 Wn. App. 607, 615-16, 5 P.3d 741 (2000).

7

In *Wiley*, the defendant contested his offender score. The trial court used his multiple convictions of felony larceny, which at that time involved stealing property valued at more than $75, in calculating the offender score. 124 Wn.2d at 680-81. Subsequent statutory amendments reclassified theft and made it a gross misdemeanor to steal property valued at less than $250. *Id.* at 681. The question was whether the trial court erred by determining that the prior convictions constituted felonies instead of misdemeanors. *Id.* at 682.

The Supreme Court held that when a statutory amendment merely changes the elements of a crime – in that case, the dollar amount element – the original classification of the crime must be used in calculating the offender score. *Id.* at 685-86. However, the court stated that "the reclassification of an entire crime to a lower level of punishment does apply retroactively to the calculation of an offender score." *Id.* at 682. The court stated,

> When the Legislature modifies the elements of a crime, it refines its description of the behavior that constitutes the crime. This does not make defendants convicted of the earlier crime any less culpable; instead, it clarifies the evidence required to prove the crime.
>
> On the other hand, when the Legislature downgrades an entire crime, it has judged the specific criminal conduct less culpable. By reclassifying a crime without substantially altering its elements, the Legislature concludes the criminal conduct at issue deserves more lenient treatment. The reclassification of a crime is no mere refinement of elements, but rather a fundamental reappraisal of the value of punishment. It is therefore highly relevant to a sentencing judge's estimation of a defendant's overall culpability and dangerousness.

*Id.* at 687-88.

Jenks argues that the removal of second degree robbery from the list of most serious offenses essentially was a reclassification of that crime that should be applied retroactively. However, we conclude that *Wiley* is inapplicable here. First, as with *Heath*, *Wiley* was decided long before the enactment of RCW 9.94A.345, which now unequivocally states that a sentence must be imposed under the law in effect when the offense was committed. Second, as with

*Heath*, the Supreme Court in *Ross* noted that *Wiley* did not address the effect of RCW 10.01.040. *Ross*, 152 Wn.2d at 239.

We conclude that *Heath* and *Wiley* do not support Jenks's argument that the 2019 amendment to RCW 9.94A.030(33) must be applied retroactively to invalidate his sentence.

### c. Applicability of RCW 9.94A.345

Jenks argues that RCW 9.94A.345 does not control because that statute applies only to offender score calculations and eligibility for sentencing alternatives. We disagree.

Jenks relies on the legislature's express statement of intent when enacting RCW 9.94A.345:

> [RCW 9.94A.345] is intended to cure any ambiguity that might have led to the Washington supreme court's decision in *State v. Cruz*, Cause No. 67147-8 (October 7, 1999). A decision as to whether a prior conviction shall be included in an individual's offender score should be determined by the law in effect on the day the current offense was committed. [RCW 9.94A.345] is also intended to clarify the applicability of statutes creating new sentencing alternatives or modifying the availability of existing alternatives.

LAWS OF 2000, ch. 26, § 1. Jenks claims that this statement of intent shows that the legislature did not intend for RCW 9.94A.345 to apply to a change in statutes that would affect an offender's status as a persistent offender.

However, the plain language of RCW 9.94A.345 applies broadly to all sentences: "*Any sentence* imposed under [the SRA] shall be determined in accordance with the law in effect when the current offense was committed." (Emphasis added.) Here, the general statement of legislative intent does not override the plain statutory language.

In addition, courts repeatedly have cited RCW 9.94A.345 in reference to sentencing issues other than offender score calculation and the availability of sentencing alternatives. *See In re Pers. Restraint of Gronquist*, 192 Wn.2d 309, 314 n.2, 429 P.3d 804 (2018) (community

custody definition); *see also State v. Coombes*, 191 Wn. App. 241, 250, 361 P.3d 270 (2015) (community custody condition); *State v. Munoz-Rivera*, 190 Wn. App. 870, 891 n.3, 361 P.3d 182 (2015) ("crime-related prohibitions" conditions); *Rivard v. State*, 168 Wn.2d 775, 781 n.3, 231 P.3d 186 (2010) (vehicular homicide classification).

We conclude that RCW 9.94A.345 applies to POAA sentences and precludes the application of the 2019 amendment to RCW 9.94A.030(33) to this appeal.

        d.    Applicability of RCW 10.01.040

Jenks argues that RCW 10.01.040 does not control because the Supreme Court has recognized an exception to the saving statute when the legislature downgrades the culpability for an offense. We disagree.

RCW 9.94A.030(33) involves the punishment for a criminal offense. As a result, it is subject to the saving statute. *Kane*, 101 Wn. App. at 613; RCW 10.01.040.

Jenks suggests that *Heath*, 85 Wn.2d at 198, and *Wiley*, 124 Wn.2d at 687-88, support an exception to RCW 10.01.040. But as noted above, the court in those cases did not even address RCW 10.01.040. Jenks notes that the court referenced these cases in *Ross*, a case that involved the application of RCW 10.01.040. But *Ross* expressly distinguished and did not apply *Heath* and *Wiley* because those cases did not address RCW 10.01.040. *Ross*, 152 Wn.2d at 239-40.

Jenks proffers no other argument that RCW 10.01.040 is inapplicable here. And the 2019 amendment to RCW 9.94A.030(33) does not express an intent that it would apply to pending prosecutions for crimes committed before its effective date.

RCW 10.01.040 "creates an easily administered, bright-line rule." *Kane*, 101 Wn. App. at 618. In addition, "there is nothing fundamentally unfair in sentencing offenders in accordance with the law they presumably were aware of at the time they committed their offenses." *Id.*

We conclude that RCW 10.01.040 applies to POAA sentences, and precludes the application of the 2019 amendment to RCW 9.94A.030(33) to this appeal.

e.    Remedial Nature of Amendment

Jenks argues that the 2019 amendment to RCW 9.94.030(3) must be applied retroactively because it is a remedial amendment.  We disagree.

Generally, a statutory amendment that is curative or remedial will be applied retroactively even without language showing legislative intent for retroactive application.  *Kane*, 101 Wn. App. at 613.  The Supreme Court in *Heath* stated that a remedial statute is presumed to apply retroactively.  85 Wn.2d at 198.  However, this general rule does not apply when a statute is subject to RCW 10.01.040.  *Kane*, 101 Wn. App. at 613.  "[A]bsent language indicating a contrary intent, an amendment to a penal statute – even a patently remedial one – must apply prospectively under RCW 10.01.040."  *State v. McCarthy*, 112 Wn. App. 231, 237, 48 P.3d 1014 (2002); *see also Kane*, 101 Wn. App. at 615.

Here, RCW 9.94A.030(33) is a penal statute because it involves the punishment for a criminal offense.  Therefore, RCW 10.01.040 requires that the version of RCW 9.94A.030(33) in effect when Jenks committed his current offense be applied at sentencing.

We conclude that the 2019 amendment to RCW 9.94A.030(33) cannot be applied to this appeal regardless of whether the amendment is remedial.

CONCLUSION

Both RCW 9.94A.345 and RCW 10.01.040 require that Jenks be sentenced based on the version of former RCW 9.94A.030(33) in effect at the time Jenks committed his current crime rather than based on the 2019 amendment to RCW 9.94A.030(33).   At the time Jenks committed his current offense, second degree burglary was a most serious offense that constituted a strike

under the POAA. Therefore, the trial court did not err in sentencing Jenks to confinement for life without the possibility of release.

We affirm Jenks's conviction and sentence, but we remand for the trial court to consider the imposition of the criminal filing fee and DNA collection fee under the currently applicable statutes.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

In the unpublished portion of this opinion, we address and reject Jenks's remaining arguments. We hold that that (1) Jenks cannot raise on appeal his argument regarding the testimony of a police criminal intelligence analyst because he did not object to that testimony in the trial court; (2) the trial court did not err in giving a jury instruction regarding expert witness testimony; (3) the trial court did not err in excluding Jenks's proffered "other suspect" evidence; (4) the trial court did not err in excluding the impeachment evidence regarding the store clerk; (5) Jenks cannot raise on appeal his argument that certain Facebook photographs were not authenticated because he did not object on that basis in the trial court; (6) the trial court did not err in declining to give a curative instruction regarding the criminal intelligence analyst's stricken testimony; (7) although the trial court's communication with an unidentified Court of Appeals judge was improper, that conduct did not violate Jenks's due process right to a fair trial; (8) Jenks is not entitled to relief under the cumulative error doctrine because he has failed to show multiple errors affecting his conviction; (9) the trial court did not violate Jenks's right to equal protection, a jury trial, or due process by finding by a preponderance of the evidence that Jenks had prior strike offenses under the POAA; and (10) the criminal filing fee and DNA

12

collection fee imposed as LFOs must be reconsidered in light of the 2018 amendments to the LFO statutes.

ADDITIONAL FACTS

*Initial Incident*

On December 8, 2014, a person robbed a Zip Trip Store in Spokane. Jeffrey Davila was the store clerk working at the time of the robbery.

Davila provided a detailed description of the male suspect to the police, including a teardrop tattoo under the suspect's right eye and a mole under his left eye. Officers also obtained the surveillance video of the incident from the store. Officer Thomas Michaud, a criminal intelligence analyst for the Spokane Police Department, ran Davila's description of the suspect through internal regional databases. Jenks was the only match for his search.

After searching Jenks's residence pursuant to a search warrant, the State charged Jenks with first degree robbery.

*Pretrial Evidence Rulings*

Before trial, Jenks filed a motion to prohibit any law enforcement officers from testifying that Jenks was the person in the surveillance video. Jenks argued that the officers were in no better position than the jury in making that determination. The trial court granted Jenks's motion. Specifically, the court ruled that it would not "provide for an officer to say the person in the video is the defendant." Report of Proceedings (RP) (Jan. 9, 2017) at 15-16.

Jenks also sought to present evidence of the robbery two weeks earlier of a Jitters Java coffee shop, which was located near the Zip Trip store, to suggest that another person may have committed the Zip Trip robbery. Jenks argued that the evidence was admissible because the two robberies were close in time and location and because the Jitters Java robber was similar in size

to the Zip Trip robber and made similar comments to the store clerk. The court prohibited any reference to the Jitters Java robbery because there was a lack of nexus between the two crimes.

Finally, Jenks argued that the trial court should allow him to cross-examine Davila regarding Davila's prior occupation as a police officer. According to the State, Davila resigned from law enforcement in 2006 after being disciplined for not properly filling out jail booking reports. The court declined to allow Jenks to cross-examine Davila on the issue, stating that Davila's resignation was too distant in time and that Davila was never charged with a crime.

*Trial*

At trial, Michaud testified that his work consisted of reviewing incident reports, looking for patterns of crime, and identifying suspects. Regarding the Zip Trip robbery, Michaud stated that he used Davila's description of the suspect to conduct a search of the police department's internal regional databases. Specifically, he used the suspect's height as well as the teardrop tattoo and the mole. Jenks was the only match for his search. The search generated a photograph of Jenks, which was admitted into evidence. Jenks did not object to any of this testimony.

Michaud then verified his search result by viewing the surveillance video and locating a Facebook account belonging to Jenks. He reviewed photographs on the account that he believed were of Jenks. Michaud also located a Facebook account linked to Jenks's account that belonged to a person that appeared to be Jenks's girlfriend. Michaud testified that there were photographs of Jenks and his girlfriend on that account. Jenks did not object to any of this testimony.

Michaud further testified that in one of the photographs, the person he believed to be Jenks's girlfriend was wearing a Chicago Bulls hat that resembled the hat depicted in the surveillance video. Jenks objected and moved to strike the testimony, and the trial court granted

the motion to strike. Jenks asked for "an instruction for the jury," but the court stated that it would address the issue later. 2 RP at 228. Later, the court explained that it typically did not give curative instructions because they serve to highlight the stricken testimony. Following that explanation, Jenks did not object or renew his request for an instruction. However, the court did give a standard jury instruction stating that the jury should not discuss any evidence that had been ruled inadmissible.

Michaud identified two photographs of the person who he believed was Jenks's girlfriend that he obtained from her Facebook account. The State moved to admit these photographs. Jenks objected only on the basis that he did not know how Michaud knew that the woman was Jenks's girlfriend. The trial court treated Jenks's comment as a standing objection but otherwise admitted the photographs. Jenks did not object to the photographs based on a lack of authentication.

*Conference on Jury Instructions*

After both sides rested, the trial court held a conference on jury instructions. During the conference, the court asked whether an expert witness instruction should be given. The State argued for the instruction, citing Michaud's "specialized training in crime analysis and more than just general law enforcement training." 2 RP at 316. Jenks objected to the instruction on the ground that Michaud was not qualified to be an expert.

The State also proposed a lesser included offense instruction for second degree robbery. Jenks objected to the instruction and the trial court asked the State whether there was any authority for giving the instruction. The State asked for a few minutes to do research on the issue.

After a brief recess, the trial court stated, "Since I was waiting around, I picked up the phone and called one of my colleagues at [the Court of Appeals] Division III, not going to say who it was, I'll just say it's a prosecutor." 2 RP at 322.

The court proceeded to inform the parties of its decisions on the proposed jury instructions, including the expert witness instruction and the lesser included offense instruction. The trial court decided to include an expert witness instruction, ruling that Michaud should be considered an expert. Jenks did not raise any objection based on the fact that the State had not disclosed Michaud as an expert in discovery.

Regarding the lesser included offense instruction, the court stated, "After just taking a look at a little bit of authority and chatting with Division III, I think it's appropriate to include it, the lesser included." 2 RP at 325. After hearing that the trial court had communicated with a Court of Appeals judge, Jenks did not ask the court to recuse itself or move for a new trial.

*Conviction and Sentence*

The jury found Jenks guilty of first degree robbery. The trial court, not the jury, made the determination that Jenks's two prior convictions were "most serious offenses" that required Jenks to be sentenced as a persistent offender.

The trial court sentenced Jenks to a term of life in prison without the possibility of release as a persistent offender for the first degree robbery conviction. The court also imposed two LFOs: a $200 criminal filing fee and a $100 DNA collection fee. The court did not make any finding of indigence for purposes of imposing LFOs. However, the court later entered an order of indigence for purposes of Jenks's appeal.

A.       ADMISSION OF MICHAUD'S TESTIMONY

Jenks argues on various grounds that the trial court erred by admitting Michaud's testimony about his database search. We decline to consider this argument because Jenks did not object to Michaud's testimony at trial.

Jenks did not object at trial to the testimony of Michaud that he now challenges on appeal. We generally do not review evidentiary issues when the defendant did not object to the evidence in the trial court. *See* ER 103(a)(1); RAP 2.5(a); *State v. Cham*, 165 Wn. App. 438, 450-51, 267 P.3d 528 (2011). However, a claim of error may be raised for the first time on appeal if it involves a manifest error affecting a constitutional right. RAP 2.5(a)(3).

First, Jenks appears to argue that any expert testimony provided by Michaud should have been excluded because the State did not disclose Michaud as an expert in discovery as required in CrR 4.7(a)(2)(ii). As Jenks notes, CrR 4.7(a)(2)(ii) requires the State to disclose in discovery information regarding expert witnesses who will testify at trial. If the failure to comply with a discovery rule is brought to the trial court's attention "during the course of the proceedings," the court can impose sanctions on the offending party. CrR 4.7(h)(7)(i).

But Jenks did not raise this issue during the course of the trial proceedings, so the trial court never had an opportunity to consider sanctions. And CrR 4.7(a)(2)(ii) does not present a constitutional issue that invokes RAP 2.5(a)(3). Jenks argues that the failure to disclose an expert can violate a defendant's constitutional right to a fair trial, citing *State v. Blackwell*, 120 Wn.2d 822, 826, 845 P.2d 1017 (1993). However, *Blackwell* involved the State's failure to disclose evidence favorable to the defendant and material either to guilt or to punishment under CrR 4.7(a)(3). 120 Wn.2d at 826. *Blackwell* did not hold that the failure to disclose an expert witness implicates a defendant's constitutional rights. The failure to identify Michaud as an

17

expert witness here did not rise to the level of a constitutional violation and did not deprive Jenks of a fair trial.

Second, Jenks appears to argue that Michaud could not give an opinion regarding the results of his database search because he did not qualify as an expert. But Jenks never objected to Michaud's testimony about his database search on this ground. And the admission of expert testimony is not a constitutional issue that invokes RAP 2.5(a)(3). *State v. Barr*, 123 Wn. App. 373, 380, 98 P.3d 518 (2004).

Third, Jenks appears to argue that Michaud's testimony violated the trial court's pretrial ruling precluding police officers from testifying that Jenks was the person in the surveillance video. Jenks did not object to Michaud's testimony on this ground. Jenks argues that he had a standing objection based on the court's ruling. But where evidence has been admitted notwithstanding the trial court's prior exclusionary ruling, the complaining party is required to object in order to preserve the error. *State v. Stein*, 140 Wn. App. 43, 68, 165 P.3d 16 (2007). Otherwise, "[a] party so situated could simply lie back, not allowing the trial court to avoid the potential prejudice, gamble on the verdict, and then seek a new trial on appeal." *State v. Sullivan*, 69 Wn. App. 167, 172, 847 P.2d 953 (1993).

Because Jenks failed to object to Michaud's testimony, he did not preserve the issue for appeal. Therefore, we decline to consider Jenks's challenge to Michaud's testimony.

B.    EXPERT WITNESS INSTRUCTION

Jenks argues that the trial court erred by instructing the jury on expert testimony despite his objection because Michaud was not qualified to offer expert testimony. We disagree.

### 1. Legal Principles

In general, we review a trial court's choice of jury instructions for an abuse of discretion. *State v. Hathaway*, 161 Wn. App. 634, 647, 251 P.3d 253 (2011). Jury instructions are appropriate if they are supported by substantial evidence, allow a defendant to argue his or her theories of the case, are not misleading, and when read as a whole properly state the applicable law. *State v. Anderson*, 3 Wn. App. 2d 67, 69-70, 413 P.3d 1065 (2018).

> ER 702 governs the admissibility of expert testimony at trial and provides:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Accordingly, under ER 702, expert testimony is generally admissible if (1) the expert is qualified; (2) the expert relies on generally accepted theories in the scientific community; and (3) the testimony would be helpful to the trier of fact. *State v. Morales*, 196 Wn. App. 106, 122–23, 383 P.3d 539 (2016). Practical experience may be sufficient to qualify a witness as an expert. *State v. Weaville*, 162 Wn. App. 801, 824, 256 P.3d 426 (2011).

We review a trial court's decision to admit expert opinion testimony under ER 702 for an abuse of discretion. *State v. Green*, 182 Wn. App. 133, 146, 328 P.3d 988 (2014).

### 2. Michaud's Expertise

Michaud worked as a criminal intelligence analyst for the Spokane Police Department. He had a master's degree in criminal justice from Washington State University. He testified that he "probably had 500 hours of law enforcement training in different subjects such as criminal intelligence analysis, [and] criminal investigative analysis" and he was also "trained by the FBI in open source intelligence." 2 RP at 220.

19

Michaud provided support for major crime units and, at the time of trial, had worked in that capacity for about seven years. He stated that his job required him to review incident reports or calls for service, look for patterns of crime, identify suspects, and find information that investigators or patrol officers might not be able to find. At trial, Michaud testified to his process of gathering information, identifying Jenks as the likely suspect of the Zip Trip robbery, and corroborating that result. Michaud testified that he was trained to "trust but verify." 2 RP at 224.

Based on his experience, training, and job responsibilities, we conclude that Michaud was qualified to offer expert testimony. The simplicity of his search in this case – a search that produced one result – does not diminish the expertise and training required for his work. By gathering information, executing the search, making an identification, and corroborating the result, Michaud interpreted the data available to him as an expert.

We hold that the trial court did not abuse its discretion in determining that Michaud offered expert testimony and therefore did not err in giving an expert witness instruction.

C.      EXCLUSION OF OTHER SUSPECT EVIDENCE

Jenks argues that the trial court erred by precluding him from presenting evidence regarding the robbery of the nearby Jitters Java coffee shop two weeks before the Zip Trip robbery. We disagree.

1.      Legal Principles

Other suspect evidence is relevant if that evidence tends to connect someone other than the defendant with the charged crime. *State v. Franklin*, 180 Wn.2d 371, 381, 325 P.3d 159 (2014). Before the trial court may admit other suspect evidence, "some combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged

crime." *Id.* The evidence must have a "logical connection to the crime." *Id.* However, "[e]vidence establishing nothing more than suspicion that another person might have committed the crime [i]s inadmissible." *Id.* at 380.

The question for admissibility of other suspect evidence is whether the proffered evidence tends to create a reasonable doubt regarding the defendant's guilt; the evidence need not establish the other suspect's guilt beyond a reasonable doubt. *Id.* at 381. In addition, the focus must be on the probative value of the other suspect evidence, not on the strength of the State's case. *Id.* at 378-79. Other suspect evidence can have a logical connection to the issues in the case even if the State's evidence strongly supports the defendant's guilt. *Id.* at 382.

We review a trial court's exclusion of other suspect evidence for an abuse of discretion. *State v. Wade*, 186 Wn. App. 749, 765, 346 P.3d 838 (2015).

2. Other Suspect Analysis

At trial, Jenks sought to present evidence that the person who committed the Jitters Java robbery also may have committed the Zip Trip robbery. The State informed the court that the Jitters Java robbery occurred a week or two before the Zip Trip robbery, and that the coffee stand was a very short distance from the Zip Trip store. Law enforcement was unable to determine whether Jenks or someone else committed that robbery.

As an offer of proof, defense counsel represented that the Jitters Java robber was of similar height to the Zip Trip robber, both were light skinned, both wore dark clothes, and both made similar statements about the money not belonging to the store clerk and not worth fighting for. However, the Jitters Java robber wore a ski mask so his face could not be identified. Law enforcement did not believe that there was sufficient evidence to charge Jenks with the Jitters

Java robbery. And nothing associated with the Jitters Java robbery was found in the search of Jenks's residence.

Jenks cites to *State v. Ortuno-Perez*, 196 Wn. App. 771, 385 P.3d 218 (2016). In that case, the trial court excluded the defendant's evidence that another person who was present at the scene may have committed the charged offense. *Id.* at 775. The evidence would have shown the other suspect's motive (a gang clash), his opportunity (he was present at the murder scene and in close proximity to defendant at the time of the crime), and his means (he was armed with a handgun). *Id*. at 791. On appeal, the court held that defendant's evidence was plainly relevant to the question of identity and was of a type that would support a reasonable doubt as to defendant's guilt. *Id*. at 791-92.

Here, Jenks's proffered evidence regarding the Jitters Java robbery pointed to another suspect that police had yet to identify. The timing and location of the other robbery and purported similarities between the suspect in the Jitters robbery and the Zip Trip robbery would not have established the other suspect's motive, opportunity, or means. In addition, the method of committing the robberies was not particularly similar. We conclude that Jenks's evidence was insufficient under the circumstances to establish the necessary connection between the two robberies and create a reasonable doubt as to Jenks's guilt. At best, Jenks's evidence established the mere suspicion that another person might have committed the Zip Trip robbery. Such evidence is speculative and is inadmissible. *Frankli*n, 180 Wn.2d at 380.

We hold that the trial court did not abuse its discretion refusing to allow Jenks to present evidence regarding the Jitters Java robbery.

D.      EXCLUSION OF IMPEACHMENT EVIDENCE

Jenks argues that the trial court erred by refusing to allow him to cross-examine store clerk Davila, the only eyewitness to the robbery, regarding his resignation from his position as a police officer years earlier. We disagree.

1.    Legal Principles

Under 608(b), a party may – in the discretion of the trial court – cross-examine a witness regarding his or her prior conduct if the conduct is probative of the witness's truthfulness or untruthfulness. Conduct involving fraud or deception can be indicative of the witness's general disposition with regard to truthfulness and therefore may be admissible under ER 608(b). *State v. Johnson*, 90 Wn. App. 54, 71, 950 P.2d 981 (1998). However, even evidence that is probative of untruthfulness is not admissible under ER 608(b) if it is too remote in time. *State v. McSorley*, 128 Wn. App. 598, 613-14, 116 P.3d 431 (2005).

We review a trial court's limitation on the scope of cross-examination for an abuse of discretion. *State v. Lee*, 188 Wn.2d 473, 486, 396 P.3d 316 (2017). And ER 608(b) expressly leaves the scope of cross-examination "in the discretion of the court." An abuse of discretion occurs when the trial court's decision is manifestly unreasonable or is based on untenable grounds or reasons. *Lee*, 188 Wn.2d at 486.

2.    ER 608(b) Analysis

At trial, Jenks sought to cross-examine Davila as to why he no longer worked as a police officer. According to the State, Davila worked as a police officer in California from 1996 to 2006. He was "disciplined for not filling out some jail booking reports appropriately"; specifically, "failing to provide medical information on booking intake forms on an inmate." 1 RP at 33. This was a policy violation. But there were no criminal charges and not even an

23

indication that formal discipline was imposed. Davila then resigned; he was not terminated. He decided that law enforcement was not for him any longer and he moved to Washington with his family. Jenks offered no further information regarding the reason Davila left law enforcement.

Davila's resignation from law enforcement was not probative of his truthfulness. There is no indication that Davila's policy violation involved dishonesty. There were no criminal charges and no evidence of any formal discipline. Further, Davila's conduct took place at least eight years before the Zip Trip robbery and over 10 years before trial.

Jenks relies on *State v. York*, 28 Wn. App. 33, 621 P.2d 784 (1980). In that case, the State's witness was an undercover investigator who was the only eyewitness to the alleged crime. *Id.* at 35. Because the State did not have any other evidence placing defendant at the scene, the investigator's "credibility was crucial to the State" and "it was simply a contest between" him and defendant's alibi witnesses. *Id.* at 35. On direct examination, the State elicited favorable aspects of the investigator's law enforcement background. *Id.* at 37. The State then sought to exclude cross-examination into unfavorable aspects of the investigator's law enforcement background. *Id.* The court found that, "as a matter of fundamental fairness," the defense should have been allowed to examine for "negative characteristics of the one most important witness" because the State sought to introduce the positive characteristics. *Id.*

But unlike the investigator in *York*, Davila no longer worked in law enforcement at the time of the robbery and the State did not seek out testimony from Davila regarding his background in law enforcement. In addition, the State had at least some other evidence to corroborate Davila's testimony: the store surveillance video.

We hold that the trial court did not abuse its discretion in refusing to allow Jenks to cross-examine Davila regarding his resignation from his position as a police officer.

E.    AUTHENTICATION OF FACEBOOK PHOTOGRAPHS

Jenks argues that the trial court erroneously admitted two photographs without proper authentication.  We decline to consider this argument because Jenks did not object on that basis at trial.

As noted above, we generally do not address an evidentiary issue when the appellant did not object in the trial court.  *See* ER 103(a)(1); RAP 2.5(a); *Cham*, 165 Wn. App. at 450-51. And even if the appellant objected to evidence at trial, this court will consider only the specific grounds for the objection raised in the trial court.  *See State v. Powell*, 166 Wn.2d 73, 82-84, 206 P.3d 321 (2009).

Here, Jenks's only objection to admission of the photographs was that Michaud had no way of knowing that the woman depicted in the photographs was Jenks's girlfriend.  Jenks did not object to the admission of the photographs on the basis that they had not been authenticated as required in ER 901(1).  He also did not object to Michaud's testimony that he located the photographs on a Facebook account linked to Jenks's Facebook account and that the photographs depicted Jenks and his girlfriend.  We also note that whether a photograph depicts a particular person generally goes to the weight rather than the admissibility of the photograph.  *See State v. Tatum*, 58 Wn.2d 73, 75-76, 360 P.2d 754 (1961).

Because Jenks did not challenge the authentication of the photographs in the trial court, we decline to consider the authentication issue at trial.

F.    CURATIVE INSTRUCTION REGARDING STRICKEN TESTIMONY

Jenks argues that the trial court abused its discretion by declining to give a curative instruction after striking Michaud's testimony comparing the hat depicted in one of the admitted photos to the hat shown in the Zip Trip surveillance video.  We disagree.

A trial court's ruling on the propriety of a curative instruction is reviewed for abuse of discretion. *State v. Gallagher*, 112 Wn. App. 601, 611, 51 P.3d 100 (2002). Although it may be preferable to give a limiting instruction contemporaneously with the evidence at issue, it is within the court's discretion to choose instead to give a limiting instruction at the close of all of the evidence. *Id.*

On direct examination, the State asked Michaud whether he presented any photos from a Facebook account linked to Jenks to a detective working on Jenks's case. Michaud responded, "Yes. There was a Facebook post or a picture of an associate . . . who I believed to be his girlfriend at the time with a Chicago Bulls hat that resembled the one that was used or that was also depicted in the surveillance video. 2 RP at 227-28. Jenks objected and moved to strike the testimony, and the trial court granted the motion to strike.[2] Jenks also asked for an instruction to the jury, but the court declined.

Jenks cites no authority that the trial court needed to do more than strike Michaud's objectionable testimony. He quotes *State v. Gresham*, in which the court stated that "[o]nce a criminal defendant requests a limiting instruction, the trial court has a duty to correctly instruct the jury." 173 Wn.2d 405, 424-25, 269 P.3d 207 (2012). However, *Gresham* is limited to the "context of ER 404(b) limiting instructions." *Id.* at 424.

Here, the trial court believed that a curative instruction would serve to highlight the stricken testimony rather than provide a cure. We conclude that this determination was within the trial court's broad discretion. In addition, the court's concluding instructions to the jurors stated, "If I have ruled that any evidence is inadmissible, or if I have asked you to disregard any

---

[2] The testimony apparently was objectionable because it arguably violated the trial court's in limine order precluding law enforcement officers from testifying that Jenks was the person in the surveillance video.

evidence, then you must not discuss that evidence during your deliberations or consider it in reaching your verdict. Do not speculate whether the evidence would have favored one party or the other." CP at 52. We conclude that this general instruction was sufficient to cure any prejudice, if any existed.

We hold that the trial court did not abuse its discretion in denying Jenks's request for a curative instruction regarding Michaud's stricken testimony.

G. TRIAL COURT COMMUNICATION WITH COURT OF APPEALS JUDGE

Jenks argues that the trial court's ex parte communication with a Court of Appeals judge regarding a pending case issue violated his due process right to a fair trial.[3] We hold that although the trial court's communication clearly was improper, it did not violate Jenks's right to a fair trial.

1. Failure to Raise Issue in Trial Court

Initially, the State argues that we should decline to address Jenks's argument regarding the trial court's communication with a Court of Appeals judge because Jenks did not raise the issue in the trial court. The State focuses on the fact that an appearance of fairness claim generally cannot be raised for the first time on appeal because it is not a constitutional claim. *State v. Blizzard*, 195 Wn. App. 717, 725, 381 P.3d 1241 (2016). If Jenks was asserting an appearance of fairness claim, we would decline to consider it under *Blizzard*.

However, Jenks expressly states that he is making a constitutional due process claim and *not* an appearance of fairness claim. An appellant may be able to raise a constitutional claim for the first time on appeal under RAP 2.5(a)(3). The State does not argue that Jenks is precluded

---

[3] Because of this issue, this case was transferred from Division III to Division II of the Court of Appeals.

from raising his due process claim, and in fact does not mention that claim at all. Accordingly, we address Jenks's constitutional claim.

    2.    Ex Parte Communication

The Code of Judicial Conduct (CJC) provides that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter, before that judge's court." CJC 2.9(A). Comment 5 to CJC 2.9(A) adds that "[a] judge may consult on pending matters with other judges, or with retired judges who no longer practice law and are enrolled in a formal judicial mentoring program (such as the Washington Superior Court Judges' Association Mentor Judge Program)" but "[s]uch consultations must avoid ex parte discussions of a case . . . with judges who have *appellate jurisdiction* over the matter." *Id*. (emphasis added).

Here, the trial court clearly violated CJC 2.9(A) by communicating with a Court of Appeals judge regarding a pending issue at trial – whether to give a lesser included offense instruction. The question is whether this improper communication is grounds for reversal.

    3.    Due Process Right to a Fair Trial

Jenks expressly states that his claim involves a constitutional due process challenge, not an appearance of fairness challenge. Due Process "establishes the minimal requirements for a fair hearing." *Blizzard*, 195 Wn. App. at 725. Due process requires that a defendant receive a fair trial before a fair judge. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004). "Denial of the constitutional right to a fair tribunal is a structural error that requires reversal regardless of prejudice." *Blizzard*, 195 Wn. App. at 727.

Whether a trial court has violated due process typically focuses on judicial bias. *See id.* at 727-28. The question is not whether a judge has an actual, subjective bias. *Id.* at 727.

Instead, we apply an objective analysis. *Id.* We ask "whether, as an objective matter, 'the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias.' " *Id.* (quoting *Williams v. Pennsylvania*, ___ U.S. ___, 136 S. Ct. 1899, 1905, 195 L. Ed. 2d 132 (2016) (internal quotation marks omitted).

In *Blizzard*, the court noted:

> Through our country's significant history of litigation, only three circumstances have been found to create unconstitutional judicial bias: (1) when a judge has a financial interest in the outcome of a case, (2) when a judge previously participated in a case in an investigative or prosecutorial capacity, and (3) when an individual with a stake in a case had a significant and disproportionate role in placing a judge on the case through the campaign process.

*Blizzard*, 195 Wn. App. at 727-28. A fourth possibility is when the judge has received highly offensive personal criticism. *Id.* at 728

4.     Analysis

This case does not fall into any of the categories of unconstitutional judicial bias recognized by the court in *Blizzard*, 195 Wn. App. at 727-28. Further, the facts that Jenks identifies do not support a finding of a due process violation here.

First, Jenks argues that having a trial court ask for advice from a Court of Appeals judge on the same court that will review the case offends the appearance of fairness. But a violation of the appearance of fairness doctrine does not implicate the constitution. *Blizzard*, 195 Wn. App. at 725.

Second, Jenks argues that the trial court's actions "served to notify Mr. Jenks that the trial court's rulings had been insulated or pre-approved by this Court, chilling the right to appeal." Br. of Appellant at 39. However, the facts of this case do not demonstrate such a chilling effect. Jenks filed a timely notice of appeal. The lesser included offense instruction was not even an

issue on appeal because the jury convicted based on the greater offense. And ultimately *the State*, not Jenks, moved to transfer the case from Division Three to this court.

Third, Jenks argues that the trial court's identification of the Court of Appeals judge he contacted as a former prosecutor added to the appearance of apparent bias. He claims that the trial court gave observers the impression that he was being advised by a senior prosecutor. Jenks emphasizes that this impression was confirmed when the court immediately ruled in favor of the State. But this argument again relates to the appearance of fairness claim, not a constitutional claim. We conclude that the Court of Appeals judge's status as a former prosecutor does not elevate these circumstances to a constitutional violation.

We recognize that there conceivably might be circumstances where communicating with a Court of Appeals judge could violate due process. But here, the record is silent as to what actually was said in the communication and the extent to which the communication affected the trial court's decision-making. And as noted above, the trial court's inclusion of a lesser included offense instruction, the issue the trial court apparently discussed with the Court of Appeals judge, ultimately was immaterial because Jenks was convicted om the greater offense.

We hold that the trial court's communication with a Court of Appeals judge regarding a pending issue at trial did not violate Jenks's constitutional right to a fair trial.

H.    CUMULATIVE EFFECT OF TRIAL COURT'S ERRORS

Jenks asserts that he is entitled to relief under the cumulative error doctrine because the combined effect of the alleged errors denied him a fair trial. We disagree.

Under the cumulative error doctrine, the court may reverse a defendant's conviction when the combined effect of trial errors effectively denies the defendant his or her right to a fair trial, even if each error alone would be harmless. *State v. Lazcano*, 188 Wn. App. 338, 370, 354

30

P.3d 233 (2015). The defendant bears the burden to show multiple trial errors and that the accumulated prejudice from those errors affected the outcome of his or her trial. *Id.*

Because Jenks has failed to show multiple errors affecting his conviction, we hold that he failed to show that the accumulated prejudice of multiple trial errors affected the outcome of his trial.

I.    TRIAL COURT FINDING PRIOR STRIKE OFFENSE

Jenks argues that his POAA sentence is invalid because having the trial court find by a preponderance of the evidence that he had prior strike offenses under the POAA rather than having the jury find that fact beyond a reasonable doubt violates (1) equal protection and (2) the right to a jury trial and due process. We disagree.

1.    Equal Protection

Jenks argues that having the trial court find by a preponderance of the evidence that he had prior strike offenses under the POAA when prior convictions that are elements of a crime must be proved to the jury beyond a reasonable doubt violates the equal protection clause of the Fourteenth Amendment of the United States Constitution.

This court previously held that the State has a rational basis for treating prior convictions under the POAA differently than prior convictions that are elements of a crime, and that having the trial court determine the existence of strike offenses does not violate equal protection. *State v. McKague*, 159 Wn. App. 489, 517-19, 246 P.3d 558, *affirmed on other grounds by* 172 Wn.2d 802 (2011). Both Division One and Division Three of this court have agreed. *State v. Williams*, 156 Wn. App. 482, 496-98, 234 P.3d 1174 (2010); *State v. Langstead*, 155 Wn. App. 448, 453-57, 228 P.3d 799 (2010). Jenks has not presented any compelling reason to disregard this authority.

We hold that having the trial court find by a preponderance of the evidence that he had prior strike offenses under the POAA did not violate Jenks's right to equal protection.

2. Right to Jury/Due Process

Jenks claims that he has a constitutional right to have a jury find beyond a reasonable doubt that he had prior strike offenses under the POAA. But this claim is inconsistent with United States Supreme Court and Washington Supreme Court precedent.

In *Apprendi v. New Jersey*, the United States Supreme Court held that "*[o]ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (emphasis added). Whether a defendant had a prior strike offense under the POAA clearly is a fact of a prior conviction.

Jenks argues that subsequent developments in United States Supreme Court jurisprudence have eroded *Apprendi*'s prior conviction exception. But our Supreme Court has stated that, based on *Apprendi*, "We have consistently held that the existence of a prior conviction need not be presented to a jury and proved beyond a reasonable doubt." *State v. Olsen*, 180 Wn.2d 468, 473, 325 P.2d 187 (2014). And our Supreme Court has expressly stated that the "argument that recent United States Supreme Court precedent dictates that his prior convictions must be proved to a jury beyond a reasonable doubt is unsupported." *State v. Witherspoon*, 180 Wn.2d 875, 892, 329 P.3d 888 (2014).

We hold that having the trial court find by a preponderance of the evidence that he had prior strike offenses under the POAA did not violate Jenks's right to a jury trial or due process rights.

J.      IMPOSITION OF LFOS

Jenks argues that under the 2018 amendments to the LFO statutes, we should remand for the trial court to strike the criminal filing fee and the DNA collection fee imposed in his judgment and sentence.  The State does not address the LFO issues.  We remand for the trial court to consider these LFOs under the currently applicable LFO statutes.

In 2018, the legislature amended (1) RCW 36.18.020(2)(h), which now prohibits imposition of the criminal filing fee on an defendant who is indigent as defined in RCW 10.101.010(3)(a)-(c); and (2) RCW 43.43.7541, which establishes that the DNA collection fee no longer is mandatory if the offender's DNA previously has been collected because of a prior conviction.  These amendments apply prospectively to cases pending on direct appeal.  *Ramirez*, 191 Wn.2d at 749-50.

Under RCW 10.101.010(3)(a)-(c), a person is "indigent" if he or she receives certain types of public assistance, is involuntarily committed to a public mental health facility, or receives an annual after tax income of 125 percent or less of the current federally established poverty level.  RCW 10.101.010(3)(a)-(c).  RCW 36.18.020(2)(h) does not prohibit imposition of the criminal filing fee if the defendant is indigent under only RCW 10.101.010(3)(d), unable to pay the anticipated costs of counsel.

Regarding the criminal filing fee, the trial court at sentencing found Jenks indigent for purposes of paying LFOs.  But the record is unclear if the court found Jenks indigent based on the definition in RCW 10.101.010(3)(a)-(c).  Because the State does not concede this issue, we remand for the trial court to address the imposition of the criminal filing fee under the current version of RCW 36.18.020(2)(h).

Regarding the DNA collection fee, the record does not show whether Jenks's DNA previously has been collected because of a prior conviction. The record shows that Jenks had two prior felony convictions, and RCW 43.43.754(1)(a) requires that DNA be collected from a person convicted of a felony. But the record does not show whether Jenks's DNA previously was collected. Because the State does not concede this issue, we remand for the trial court to address the imposition of the DNA collection fee under the current version of RCW 43.43.7541. On remand, the State will have the burden of proving that Jenks's DNA has not previously been collected because of a prior conviction. *State v. Houck*, 9 Wn. App. 2d 636, 651, 446 P.3d 646 (2019), *review denied*, 194 Wn.2d 1024 (2020).

## CONCLUSION

We affirm Jenks's conviction and sentence, but we remand for the trial court to consider the imposition of the criminal filing fee and DNA collection fee under the currently applicable statutes.

MAXA, C.J.

We concur:

MELNICK, J.

GLASGOW, J.