# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58911-7-II |
| Respondent, | |
| v. | |
| SIMEON CRUZ, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Margie and Simeon Cruz[1] were foster and adoptive parents to five children. After years of living in the Cruzes' house, the children reported extensive physical and sexual abuse at the hands of Margie and Simeon, and they were taken into protective custody. The State charged Simeon with multiple counts of first degree rape of a child, first degree assault of a child, and animal cruelty. The charging periods for each crime spanned many years.

Margie and Simeon were codefendants at trial. In closing arguments, the State discussed multiple instances of child rape and child assault for each victim and each defendant, but it failed to elect which of Simeon's and Margie's many alleged acts jurors should rely on when considering each individual child rape and child assault charge. The State also failed to propose, and the trial court did not give, an instruction that the jury needed to be unanimous as to which of Simeon's and Margie's acts it relied on to convict for each charge. The State concedes this was a constitutional violation of Simeon's and Margie's rights to jury unanimity.[2]

---

[1] For clarity, we refer to the defendants by their first names.

[2] Margie's convictions are addressed in a separate opinion.

The jury convicted Simeon of 3 counts of first degree child rape, 1 count of first degree child assault, 1 count of third degree child assault, and 1 count of second degree animal cruelty against the family dog. Based on the jury's guilty verdicts, the trial court sentenced Simeon to an indeterminate sentence of 318 months to life and imposed several community custody conditions.

The State concedes on appeal that its failure to elect specific instances in the absence of a unanimity instruction was constitutional error. However, the State argues that this error was harmless for all counts except the first degree child assault conviction, which it concedes should be reversed.

The failure to elect specific instances or provide a unanimity instruction is only harmless if no rational juror could have reasonably doubted any of the alleged instances of the crime. *State v. Coleman*, 159 Wn.2d 509, 512, 150 P.3d 1126 (2007). This standard ensures that a defendant is not deprived of their constitutional right to a unanimous verdict because some jurors believed that certain alleged instances occurred, while others did not believe that those instances occurred and voted to convict based on other instances.

We accept the State's concession of error. Because the State discussed so many instances of child rape and assault in closing without making an election, and because there was conflicting testimony regarding some instances, we conclude that a rational juror may have reasonably doubted some of the alleged instances for Simeon's third degree child assault conviction and first degree child assault conviction. Accordingly, we conclude the State's error was not harmless for those counts. We reverse those convictions and remand for a new trial.

In contrast, because we find no conflicting testimony raising reasonable doubt as to the alleged instances that supported the three first degree child rape charges, we find the unanimity

error to be harmless with regard to those counts. We affirm all three first degree child rape convictions.

Simeon also challenges several evidentiary decisions and jury instructions, none of which constitute reversible error. Additionally, he appeals several community custody conditions, all of which we uphold. Thus, we reverse in part and affirm in part. We affirm the three convictions for first degree child rape and the conviction for second degree animal cruelty. We reverse the convictions for first degree child assault and third degree child assault. We remand to the trial court for a new trial on the reversed convictions and resentencing on the remaining convictions in accordance with our opinion.

FACTS

I. BACKGROUND

Margie and Simeon were foster parents, and eventually adoptive parents, to four children: KC (a boy born in 2004); AC (a boy born in 2008); ZC (a girl born in 2009); and JC (a girl born in 2010). They also fostered MR (a girl born in 2004) for two years. Additionally, Margie and Simeon had two pets: a dog named Pepper and a cat named Misty.

On July 7, 2020, KC snuck out of the Cruzes' house and reported Margie's and Simeon's treatment of him and his siblings to a neighbor. The neighbor called the police who arrived at the Cruzes' house and put the children under protective custody.

On July 9, police arrested Margie and Simeon Cruz at their house. After being taken into state custody, the children were medically examined and participated in forensic interviews. Both the nurse examiner and the forensic interviewer later testified at trial.

The children described the Cruz household as an environment of constant and serious physical and sexual abuse. The alleged instances of abuse are too numerous to list, so we focus on instances that the State relied on for each charge.

The children stated that Margie and Simeon would consistently beat them with their hands and other household objects, including wire brushes, belts, brooms, and toys. And to punish the children for perceived bad behavior, Margie and Simeon would force them to kneel on sharp objects like cheese graters and uncooked rice or sleep on cold surfaces without bedding like uncarpeted floor or in the garage during winter. The children explained that this kind of abuse occurred almost daily. Some of them alleged being forced to take ice baths or cold showers as punishment. Three of the children—JC, KC, and MR—said that Simeon sexually assaulted and anally raped them multiple times while they lived in the Cruzes' house. Simeon would take them into his bedroom, usually when Margie was not home, lock the door, and anally rape them. KC also alleged that Simeon sexually assaulted him during overnight trips to local casinos when he was a teenager.

The children also described how Margie and Simeon treated Pepper and Misty, the family dog and cat. Relevant here, the children said that Margie and Simeon would kick Pepper and Simeon repeatedly used a shock collar on Pepper.

As a result of the children's allegations, the State charged Simeon with several crimes with long charging periods, some extending more than a decade:

- Count I: first degree child rape of JC between November 30, 2010, and July 7, 2020.
- Count II: first degree child rape of KC between March 28, 2004, and March 27, 2016.
- Count III: first degree child rape of MR between January 1, 2011, and December 31, 2013.
- Count IV: first degree child assault of JC between November 30, 2010, and July 7, 2020.[3]

---

[3] The jury convicted of a lesser included crime of third degree child assault.

- Count V: first degree child assault of AC between April 22, 2008, and July 7, 2020.[4]
- Count VI: first degree child assault of ZC between January 29, 2009, and July 7, 2020.[5]
- Count VII: second degree animal cruelty of Pepper between January 1, 2004, and July 9, 2020.
- Count VIII: second degree animal cruelty of Misty between January 1, 2004, and July 9, 2020.[6]

## II. TRIAL

A.   Children's Testimony

Generally, JC testified that Simeon threatened her and anally raped her on several occasions while she was alone with him in his locked bedroom. JC also stated that Simeon inserted a purple object into her anus. KC similarly testified that Simeon anally raped him on multiple occasions in Simeon's bedroom while Margie was at work. KC also testified that Simeon forcibly raped him at the Little Creek Casino while the family was on overnight outings there when he was a teenager. MR also testified about several instances where Simeon forcibly performed sexual acts on her or forced her to perform sexual acts on him in his bedroom, including one instance where he sexually assaulted MR by forcing her to perform oral sex on him on his birthday.

Regarding physical abuse, JC testified that Simeon often hit her, both with his hands and with belts, and sometimes he would force her to sleep on the garage floor as a punishment. JC also stated that Simeon accidentally stabbed her leg when he held a knife in her direction while driving a car. AC testified about many instances of significant physical abuse from Simeon, including Simeon beating AC with his fists and various objects, cutting AC with a knife, leaving a scar on AC's back, and shooting a BB gun in AC's direction.

---

[4] The State concedes that reversal on this count is appropriate.
[5] The jury found Simeon not guilty of this charge.
[6] The trial court dismissed this charge with prejudice upon a motion from the State.

Additional testimony about specific instances of abuse is addressed below in the relevant portions of the analysis.

B.     Testimony of the Forensic Interviewer and Nurse Practitioner

During trial, the State called Sue Villa, the forensic interviewer who interviewed the children, as a witness. Villa testified that a forensic interview is generally "designed to be non-leading and just gather information provided by the child to document whatever it is they have to say about whatever they've experienced." 4 Verbatim Rep. of Proc. (VRP) at 1813. Villa stated that during forensic interviews with children, she explains that the child should only tell the truth and tries to use mostly open-ended questions instead of leading or yes-or-no questions.

Villa also testified that it was very unlikely that a child could disclose every relevant memory of abuse during a single forensic interview, stating, "Because in my experience that's not how memory works. It tends to come out a little bit more over time." 4 VRP at 1857. Additionally, "[n]ot all children are ready to talk about everything in the first interview," and the interviews are often time limited. 4 VRP at 1843. Accordingly, Villa stated that she does not ask children "is that everything that's ever happened to you[?]" or equivalent questions during forensic interviews. 4 VRP at 1857.

The State also called Lisa Wahl, a nurse practitioner, to testify as a medical fact witness because she examined the children while they were in state custody. Wahl described the specific clinical elements involved in a child torture diagnosis, which included multiple or prolonged instances of abuse combined with at least two factors that establish the necessary dehumanization.

After detailing the children's disclosures and physical symptoms, Wahl testified that she assessed AC with "[c]hronic and severe physical abuse with torture" based on her "training and

experience." 5 VRP at 1912. She diagnosed ZC with "[p]hysical abuse." 5 VRP at 1918. Wahl said that her diagnosis of JC was that she had been "sexually abused and she was tortured." 5 VRP at 1923.

Defense counsel moved to strike Wahl's testimony "related to sexual abuse" for all of the children she discussed because Wahl was not an expert and improperly gave her opinion as to the ultimate issue. *Id.* Defense counsel did not object to the statements that AC or JC was tortured. The trial court denied the motion to strike, concluding that Wahl gave permissible testimony about her diagnoses.

C.      Admission of Audio Recordings

During trial, the State moved to admit audio recordings that KC took of Margie and Simeon without their knowledge or consent. There were three recordings: two of Margie scolding the children, including one where JC said that Margie was hurting her, and one where Margie and Simeon reprimanded one of the children for not listening to them about schoolwork.

Margie's attorney questioned the relevance of these recordings because they did not include any threats, though he acknowledged that the recordings may actually be useful for the defense because they demonstrated that Margie and Simeon were simply strict parents and not physically abusive. Simeon's attorney stated that the two recordings of only Margie should not be considered for the State's case against Simeon, and that the final recording "begs the jury to assume that they are violent people simply because they raise their voices due to displeasure. And that is more prejudicial than probative." 3 VRP at 1253.

The trial court admitted the recordings because they went to KC's state of mind and, rather than being prejudicial, they potentially supported the defense.

D.      Margie's and Simeon's Testimony

Simeon generally denied ever assaulting or molesting any of the children or pets, and he

denied all of the specific instances of abuse the children had alleged.

Margie similarly denied ever assaulting or molesting any of the children or pets. She also

denied ever seeing Simeon sexually or physically assault any of the children.

E.      Jury Instructions

1.      Introductory instructions

The trial court instructed the jury that the State has the burden of proving each element of

each crime beyond a reasonable doubt. The trial court informed the jurors that the defendants were

presumed innocent, and this presumption continued "unless during your deliberations you find it

has been overcome by the evidence beyond a reasonable doubt." Clerk's Papers (CP) at 19.[7]

2.      Child assault & animal cruelty instructions

The trial court determined that second, third, and fourth degree child assault were lesser

included offenses of first degree child assault. Therefore, the trial court gave instructions defining

each degree of assault of a child. The trial court told the jury that an individual is guilty of first

degree child assault if they are eighteen or older, the child is under the age of thirteen, and

> the person intentionally assaults the child and causes *substantial bodily harm*, and
> the person has previously engaged in a pattern or practice either of assaulting the
> child which has resulted in bodily harm that is greater than transient physical pain
> or minor temporary marks, or causing the child physical pain or agony that is
> equivalent to that produced by torture.

---

[7] Because this is a linked case with codefendants, the records on appeal overlap significantly.
The content and pagination of the trial transcripts are identical between the two cases. And the
Clerk's Papers contain many of the same documents. Where we cite to briefs or Clerk's Papers
from the other case, 58746-7-II, we indicate the case number accordingly.

CP at 34 (emphasis added); *see also* RCW 9A.36.120.

The trial court instructed the jury on second degree child assault, which is the same as first degree child assault except the level of harm inflicted must be "bodily harm that is greater than transient physical pain or minor temporary marks," rather than "substantial bodily harm." CP at 42; *see also* RCW 9A.36.130.

The trial court instructed the jury that an individual is guilty of third degree child assault if they are eighteen or older, the child is under the age of thirteen, and

> the person (1) with criminal negligence, causes bodily harm to the child by means of a weapon or other instrument or thing likely to produce bodily harm, or (2) with criminal negligence, causes bodily harm to the child accompanied by substantial pain that extends for a period sufficient to cause considerable suffering.

CP at 49; *see also* RCW 9A.36.140.

The to-convict instruction in the standard jury instruction for third degree child assault in Washington includes the following:

> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. *On the other hand, if after weighing all the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty*.

11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 35.39 (5th ed. 2024) (WPIC) (emphasis added). But in this case, the trial court omitted the italicized final sentence in its to-convict instructions for third degree child assault. In all of its other to-convict jury instructions, except for third degree child assault, the trial court provided the standard to-convict jury instruction.

The trial court instructed the jury that fourth degree child assault requires that the defendant assaulted the child. Relevant here, assault is an intentional touching with unlawful force that is

9

harmful or offensive or an intentional act to inflict bodily injury upon another, regardless of whether there is any resulting physical injury. Assault is also defined as an intentional act to create a reasonable apprehension and imminent fear of bodily injury in another. "Bodily injury" means "physical pain or injury, illness, or an impairment of physical condition." CP at 28.

The trial court instructed the jury that a defendant is guilty of second degree animal cruelty

if, under circumstances not amounting to first degree animal cruelty, the person knowingly, recklessly, or with criminal negligence inflicts unnecessary suffering or pain upon an animal and/or failed to provide necessary shelter, rest, sanitation, space, or medical attention for the animal and as a result the animal suffered substantial and unjustifiable physical pain.

CP at 64. This instruction, which the State proposed, omitted language requiring the defendant to be an owner of the animal under the second prong of the definition regarding failure to provide necessary shelter, rest, sanitation, etc. *See* Former RCW 16.52.207(2)(a) (2020).

3.      Unanimity & verdict instructions

With regard to alternative means, the trial court instructed the jury that to convict the defendants of first, second, or third degree child assault or second degree animal cruelty, the jurors "need not be unanimous as to which of [the] alternatives . . . has been proved beyond a reasonable doubt, as long as each juror finds that at least one of the alternatives has been proved beyond a reasonable doubt." CP at 35-37, 43-45, 50-52, 65-66. In contrast, for all counts, the State did not propose, and the trial court did not provide, an instruction informing the jurors that they needed to be unanimous as to which specific act or instance constituted the basis for each count, commonly called a *Petrich* instruction. *See State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984).

In its final instruction regarding verdict forms, the trial court stated that the jury "must fill in the blank provided in each verdict form [with] the words 'not guilty' or the word 'guilty',

according to the decision you reach." CP at 75. The instruction later explained how to fill out verdict forms, stating several times that, "If you cannot agree on a verdict, do not fill in the blank provided in [the] verdict form." CP at 76. The instruction concluded by stating, "When all of you have so agreed, fill in the verdict forms to express your decision." CP at 77. This language is consistent with the standard concluding instruction for criminal trials. *See* WPIC 151.00.

Defense counsel objected to the use of the word "when" in the conclusion of the instruction, arguing that it improperly implied the jury must reach a verdict. The trial court denied defense counsel's request to change the phrasing of this instruction.

F.      Closing Arguments

1.      Specification of acts or incidents

Both parties agree that during closing arguments, the State discussed multiple specific incidents of child rape and child assault that each child testified to and that occurred during the lengthy charging periods. The prosecutor did not elect single instances of Margie's or Simeon's alleged behavior for the jury to rely on when deciding whether to convict on each count. Instead, the State repeated much of the children's testimony, often listing several of Margie's and Simeon's alleged acts as the bases for convicting on a single count. We discuss the specific acts raised in closing argument in more detail below.

III. VERDICT & SENTENCING

The jury found Simeon guilty of the following crimes:

- Count I: first degree child rape of JC.
- Count II: first degree child rape of KC.
- Count III: first degree child rape of MR.
- Count IV: third degree child assault of JC, originally charged as first degree child assault.
- Count V: first degree child assault of AC.

- Count VII: second degree animal cruelty of Pepper.

The jury found Simeon not guilty of Count VI, child assault of ZC. The jury could not reach a verdict as to Count VIII, second degree animal cruelty of Misty the cat, so the trial court dismissed that count on the State's motion.

The trial court sentenced Simeon to an indeterminate sentence with a minimum of 318 months and a maximum of life and lifetime community custody. The trial court also imposed several community custody conditions on Simeon. While in community custody, Simeon must "[r]emain within geographic boundary, as set forth in writing by the Community Corrections Officer." CP at 98. Simeon also cannot "loiter in, nor frequent places where children congregate, to include parks, video arcades, shopping malls, ETC." CP at 99. Finally, Simeon must consent to allow home visits "to monitor compliance with supervision," which include "access for the purpose of visual inspection of all areas of the residence in which the offender lives or has exclusive/joint control/access." CP at 98.

## ANALYSIS

In addition to the arguments made in his own briefing to this court, Simeon adopts the arguments raised by his codefendant, Margie Cruz, on appeal under RAP 10.1(g).

### I. JURY UNANIMITY

A.    Specifying Acts or Instances

Simeon argues that his child rape and child assault convictions should be reversed because the State failed to either propose a jury unanimity instruction or elect a single act for each count. The State concedes this was constitutional error. But the State argues that this error was harmless beyond a reasonable doubt for Simeon's convictions on Count I (first degree child rape of JC),

Count II (first degree child rape of KC), Count III (first degree child rape of MR), and Count IV (third degree child assault of JC). However, the State concedes that Simeon's conviction for Count V (first degree child assault of AC) should be reversed because the unanimity error was not harmless for this count.

  1.    Legal principles

The federal and state constitutions guarantee criminal defendants the right to a unanimous jury verdict. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. When several acts are alleged and any one of them "could constitute the crime charged," but the defendant is charged with only one count of criminal conduct, there are two ways to protect jury unanimity. *State v. Beasley*, 126 Wn. App. 670, 682, 109 P.3d 849 (2005). Either the State must elect one incident to seek conviction on for each count, or the trial court has to instruct the jury that it must unanimously agree that "the same underlying criminal act" has been proved beyond a reasonable doubt for each count. *Id.*

Where there was no election or unanimity instruction, "some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988), *abrogated on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014).

We will reverse a conviction based on this error unless the State can demonstrate the error was harmless beyond a reasonable doubt. *Coleman*, 159 Wn.2d at 512. The failure to elect a specific incident or provide a unanimity instruction is only harmless "if no rational juror could have a reasonable doubt as to any of the incidents alleged." *Id.*

Generally, we find a unanimity error harmless where the jury convicted the defendant and there is "no material difference in the evidence supporting one act and the evidence supporting

another." *State v. Aguilar*, 27 Wn. App. 2d 905, 928, 534 P.3d 360 (2023). Specifically, courts have affirmed convictions where there is not direct contravening evidence for any asserted instance and the defendant provided only a general denial, such that the jury either believed the victim or the defendant. *State v. Bobenhouse*, 166 Wn.2d 881, 894-95, 214 P.3d 907 (2009).

In *Bobenhouse*, the child victim testified that the defendant sexually assaulted the victim by forcing the victim to perform oral sex and inserting his finger into the victim's anus. *Id.* at 893. In closing, the State did not specifically elect either of these instances as the basis for one first degree child rape count, and the trial court did not provide a unanimity instruction. *Id.* at 894. The Washington Supreme Court held that this error was harmless because each incident was "independently capable of constituting" first degree child rape, the defendant offered only a general denial, and "the jury had no evidence on which it could rationally discriminate between the two incidents." *Id.* at 894-95. Because there was no evidence differentiating each instance— there was only consistent testimony from the victim and general denials from the defendant—if the jury believed one incident happened, "it must have believed each of the incidents happened." *Id.* at 895. In other words, without additional distinguishing evidence, the jury either believed the victim or the defendant, and the conviction itself demonstrated that the jury believed the victim.

Similarly, in *State v. Camarillo*, the Washington Supreme Court held that the failure to elect an instance or provide a unanimity instruction was harmless error where the child victim's testimony was detailed and consistent, there was no conflicting testimony, and the defendant provided only general denials. 115 Wn.2d 60, 70-72, 794 P.2d 850 (1990), *abrogated on other grounds by State v. Crossguns*, 199 Wn.2d 282, 505 P.3d 529 (2022). Though there was additional corroborative evidence for one of the instances, the court emphasized that it was the lack of

"'direct, contravening evidence,'" like conflicting testimony, that made the error harmless. *Id.* at 70 (quoting *State v. Camarillo*, 54 Wn. App. 821, 828, 776 P.2d 176 (1989)).

In contrast, in *Kitchen*, a consolidated case, the Washington Supreme Court held that the failure to elect an instance or provide a unanimity instruction was reversible error because there was "conflicting testimony" regarding some of the instances so "a rational juror could have entertained reasonable doubt as to whether one or more of them actually occurred." 110 Wn.2d at 412. For one of the defendants,

> [t]he victim described in detail the place and circumstances surrounding several incidents that could constitute the crime charged, but was not always certain as to exact dates. The defense introduced evidence of several past contradictory statements made by the victim, in which she stated that the allegations against her father were fabricated. The jury also heard testimony from witnesses testifying generally to Mr. Kitchen's and his daughter's character and reputation, and to circumstances and conversations surrounding and following the alleged acts.

*Id.* at 406-07. Thus, a rational juror could have had reasonable doubt as to at least one instance that could have been the basis for the verdict and, therefore, the error was not harmless. *Id.* at 412.

For another defendant in *Kitchen*, a witness refuted some of one victim's testimony and another victim had made conflicting statements about the extent of the molestation that was the basis for a charge. *Id.* at 407. And witnesses testified about one victim's potential motive to lie. *Id.* This evidence also raised reasonable doubt as to at least one alleged instance and therefore the unanimity error was not harmless. *Id.* at 412.

Similarly, in *Coleman*, the State conceded that testimony was inconsistent about one alleged instance of molestation during a movie. 159 Wn.2d at 513. The child victim's teacher and a social worker testified that the victim said the defendant touched her inappropriately during a specific movie. *Id.* at 514. However, the victim's school counselor testified that the victim said

15

"'nothing really happened'" during the movie, and the victim herself denied that anything occurred during the movie at trial. *Id.* (quoting the record). The Washington Supreme Court held that under these facts involving conflicting testimony, the failure to elect an instance or provide a unanimity instruction was not harmless error. *Id.* at 514-15.

In *Aguilar*, Division One also reversed the defendant's rape conviction because the failure to elect an instance or provide a unanimity instruction was not harmless. 27 Wn. App. 2d at 930. The defendant admitted that he had sexual intercourse with the victim once on the couch and once in the bedroom. *Id.* at 929. "His defense instead focused on consent and attempted to puncture [the victim's] credibility by highlighting what he characterized as inconsistencies with her story and between her testimony and the physical evidence." *Id.* He argued that there was no physical evidence indicating the alleged break in, no fingerprints on one of the weapons he allegedly used, and no signs of trauma to the victim's sexual organs. *Id.* He also pointed out absences in the State's evidence, including the lack of testimony from the victim's neighbors about potential shouting from her apartment, the lack of the victim's ripped clothes as exhibits, and the State's failure to investigate the defendant's alleged use of the victim's phone on the evening in question. *Id.* Division One determined that a rational juror could have had a reasonable doubt as to one or both of the instances that served as the basis for the rape charge. *Id.* at 930. The court concluded that "the jury in this case had more evidence to weigh and consider than only the victim's testimony countered by the defendant's blanket denial. . . . The manner of Aguilar's entry into the apartment was contested, as were the events leading to sexual intercourse." *Id.* Additionally, some of the defendant's arguments about the weight of evidence and the victim's testimony went to one act where some went to the other, "and the jury could therefore differentiate between them." *Id.*

Thus, under the Washington Supreme Court's decisions in *Bobenhouse* and *Camarillo,* unanimity error may be harmless where the defendant offered a blanket denial, the quality and quantity of evidence supporting the various instances that could have formed the basis for the conviction are not materially different, and it is clear the jury believed the victim and disbelieved the defendant with regard to whether all instances occurred. But both the Washington Supreme Court and this court have concluded that unanimity error is not harmless where at least one instance that forms the basis for the conviction is undermined by conflicting testimony or evidence in addition to the defendant's blanket denial.

2.     <u>Count I: first degree child rape of JC</u>

During trial, JC testified that Simeon first put his penis in her anus when she was six or seven years old. JC testified that on this occasion, she was alone with Simeon in his bedroom with the door locked, and Simeon threatened to hit her with a belt if she did not do what he wanted. KC generally confirmed that there were times when JC was in Simeon's bedroom with the door locked, and that she wore a robe similar to the one that was used when Simeon sexually assaulted KC.

JC also testified that on another occasion Simeon inserted a purple object with rings into her anus. Defense counsel highlighted that JC mentioned the purple object in a hearing before trial and not in other prior interviews. However, the trial court admitted a statement from a social worker that immediately after JC's forensic interview, JC was upset because "she forgot to tell the interviewer . . . about the purple thing that had rings around it that Mr. Cruz would stick up her butt." 5 VRP at 2317. The police did not find any similar objects during their search of the Cruzes' house, and Margie testified that she did not see this kind of object in the house.

While JC testified that Simeon assaulted her many times, in his briefing, Simeon identifies these two instances as the only instances that the State relied on in closing arguments for this charge.

Like in *Bobenhouse* and *Camarillo*, JC provided specific and detailed descriptions of both alleged instances, and Simeon only gave a general denial that they occurred. After hearing testimony from both JC and Simeon, the jury obviously did not find Simeon's general denial credible because it convicted him of first degree child rape of JC. Simeon argues that JC failed to mention the incident involving a purple object in prior interviews, and the police failed to find the purple object in the house. But neither of these facts necessarily conflicts with JC's account, especially given that JC immediately told the social worker that she forgot to mention this instance to Villa. This nondisclosure is also consistent with Villa's explanation that her interview was not comprehensive—she never asked the children to recount all instances of abuse—so it was not surprising that there were instances the children did not mention to her. In fact, no interviewer testified that they asked the children to disclose every instance of abuse they experienced. And it is undisputed that the Cruzes had a couple of days between when the children were taken and when police executed a search warrant, which undermines the argument that the absence of the purple object in the home directly conflicted with JC's testimony.

The case law about unanimity emphasizes that it is the *conflicting* nature of the evidence regarding a particular instance that matters when applying the harmless error analysis. *See Bobenhouse*, 166 Wn.2d at 894-95; *Camarillo*, 115 Wn.2d at 70-72. Here, the evidence about the purple toy was not actually conflicting. Accordingly, we affirm Simeon's conviction for first degree child rape of JC based on the lack of truly conflicting evidence, Simeon's general denial,

the fact that the jury believed JC's testimony and not Simeon's general denial, and the similarity in the quality and quantity of evidence regarding the two instances discussed in closing.

### 3. Count II: first degree child rape of KC

During trial, KC testified that Simeon penetrated him anally "too many [times] to give a number." 3 VRP at 1230. Other children also testified about KC's interactions with Simeon. ZC stated that she saw KC go into Simeon's bedroom alone and heard KC whimpering. ZC also testified that KC and Simeon would "throw blankets over themselves" when she entered the bedroom, and KC would leave the room walking with a limp. 5 VRP at 2211. MR testified that she observed KC go into Simeon's locked bedroom and saw KC remove tissues from his underwear after one of these occasions.

During closing arguments, the State focused on three incidents of child rape. First, KC testified that Simeon first anally penetrated him when he was five. KC stated that he was watching television in Simeon's bedroom while Margie was at work, and Simeon pulled down KC's pants while he was lying down and penetrated him. There were some inconsistencies as to how old KC was when this occurred: in a forensic interview, KC said he was four or five years old, and in a defense interview, KC said he was four years old.

Second, KC also testified that Simeon inserted vibrators into him. KC did not mention any "foreign objects" associated with the sexual assault in two prior interviews. 5 VRP at 1895. Additionally, the police did not find any vibrators during their search of the Cruzes' house, and Margie testified that she did not see any vibrators in the house.

Third, KC stated more generally during trial that Simeon sexually assaulted him in "[t]ents outside the house" and at the Little Creek Casino on two of KC's birthdays when he was a teenager. 3 VRP at 1231.

Simeon argues that a rational juror may have had a reasonable doubt regarding the instances mentioned in the State's closing argument regarding Simeon's sexual assault of KC.

However, there was "no material difference in the evidence supporting" each of the three instances the State relied on in closing. *Aguilar*, Wn. App. 2d at 928. For each instance, KC gave consistent testimony and Simeon provided only a general denial. And the evidence that Simeon highlights in his briefing to distinguish the instances was not "'direct, contravening evidence'" that any of the instances occurred. *Camarillo*, 115 Wn.2d at 70 (quoting *Camarillo*, 54 Wn. App. at 828). Simeon notes that like the purple object mentioned by JC, the police did not find any vibrators in the Cruzes' house, and Margie testified that she never saw vibrators in the house. Additionally, in previous interviews, KC did not mention any "foreign objects" associated with Simeon's sexual assault. 5 VRP at 1895. However, this is the same kind of evidence that Simeon raised with regard to JC's allegations of first degree child rape, and the evidence at issue here similarly does not directly conflict with KC's testimony.

Regarding the Little Creek Casino instances, the to-convict instruction was clear about the charging period and the requirement that the rape had to occur when KC was 12 years old or younger. We presume that the jury followed its instructions. *State v. Lee*, 32 Wn. App. 2d 137, 148, 553 P.3d 740 (2024). The fact that the Little Creek Casino instances happened outside of the charging period does not *conflict* with KC's testimony that they occurred. Because of KC's consistent, detailed testimony and the lack of direct, contravening evidence as to any of the three

alleged instances, we can conclude that if the jury believed one incident happened, "it must have believed each of the incidents happened." *Bobenhouse*, 166 Wn.2d at 895.

The fact that one instance was outside of the charging period is immaterial where, as here, we have concluded the jury must have believed the victim with regard to *all* of the alleged instances. The remaining two instances were sufficient and lacked contradictory testimony other than a general denial such that they were sufficient to support the conviction. Thus, we conclude that this error was harmless and affirm Simeon's conviction for first degree child rape of KC.

4. <u>Count III: first degree child rape of MR</u>

MR testified generally that Simeon would take her into his bedroom and perform sexual acts on her. MR said that Simeon told her she would be harming her family if she ever told somebody about the sexual assaults. MR testified that she could not remember how many times Simeon sexually assaulted her while she lived in the Cruzes' house between the ages of seven and nine. And she stated that the sexual assaults continued after she moved out of the house when she would come back to visit her siblings.

MR testified that the first time Simeon sexually assaulted her, she was lying on the bed on her side and Simeon started performing forced oral sexual assault on her. She said she was wearing blue shorts with a moon and sun on them.

MR testified that the first time Simeon penetrated her, she was lying on his bed facing the computer and Simeon inserted his penis into her anus, which "hurt a lot." 4 VRP at 1672. MR said she was seven or eight years old when this occurred. MR stated that after sexual assaults, Simeon would take her into the bathroom and put toilet paper against her so that nothing would come out

on her underwear. KC corroborated this when he testified that once while he was playing with MR, she removed a tissue with semen on it from her pants.

Finally, MR testified that Simeon sexually assaulted her by forcing her to perform oral sex on him on his birthday. MR said Simeon put his hand on her head and told her not to bite and to open her mouth. MR did not mention this incident in a prior forensic interview.

In closing, the State specifically referenced these three instances, and these are the only instances that Simeon argues in his briefing on appeal. Like in the Supreme Court's decisions *Bobenhouse* and *Camarillo*, MR described all three of these instances in substantial detail, and Simeon provided only a general denial that they occurred. Simeon argues that the amount of detail MR gave for each instance, and the corroborating evidence from KC regarding Simeon's anal rape of MR, differentiates the instances such that a juror could distinguish between them and have a reasonable doubt as to one or more. However, that is not how courts typically interpret this kind of evidence: MR's uncontroverted testimony, regardless of how detailed, is the only thing supporting each instance, except for the additional *corroborating* testimony from KC regarding the anal rape. Following the reasoning in *Bobenhouse*, where there is no direct *contravening* evidence for any asserted instance and Simeon provided only a general denial, we may conclude that the jury believed MR based on the fact that the jurors convicted Simeon, despite his general denial.

Simeon contends that MR's failure to mention the instance where Simeon sexually assaulted her by forcing her to perform oral sex on his birthday in a prior forensic interview is sufficient to raise a reasonable doubt as to whether that instance occurred. However, this failure does not affirmatively controvert or weaken the plausibility of MR's testimony. This is particularly

true where Villa testified that forensic interviews with children are not meant to force disclosure of every instance of abuse, and to expect that a child would disclose all instances of abuse in one interview would be unrealistic. Because the failure to mention this instance in a prior interview was not *contravening* evidence in light of Villa's explanation of how such interviews are conducted, we find that the unanimity error was harmless beyond a reasonable doubt. Accordingly, we affirm Simeon's count of first degree child rape of MR.

     5.      <u>Count IV: third degree child assault of JC</u>

Simeon was charged with first degree child assault of JC, but the jury only convicted him of third degree child assault.

JC testified to years of physical abuse from Simeon. For example, she stated that he hit her with his hands and a belt as punishment. JC also said that Margie and Simeon forced her to sleep on the garage floor without blankets as a punishment. In addition to JC's testimony, KC testified that he saw Simeon hit JC when she could not answer a question correctly during homeschooling. KC also testified to several other violent incidents, including Simeon hitting JC with belts. AC also saw Simeon hitting JC. And ZC testified that Margie and Simeon would force JC to kneel on rice and cheese graters, though JC remembered only Margie asking her to kneel on other objects like a meat tenderizer and frozen peas. ZC also said that JC was forced to sleep in the garage in winter.

JC testified that when she was about seven years old, she kicked the back of Simeon's seat in the car, and he pulled out a pocketknife and held it pointed at her while he was driving. JC said she started moving because she was scared and "got stabbed" in the leg by the knife as a result. 5

VRP at 2263. A photograph of a scar on JC's leg was admitted as evidence. However, initially JC could not remember an incident in the car with Simeon.

Regarding this count, the State concedes that even if the jury believed that every alleged instance of assault against JC occurred, "it would still not be certain beyond a reasonable doubt that each one of these acts constitutes the crime of assault of a child in the third degree." Br. of Resp't at 23. However, the State argues that the failure to specify an instance or provide a unanimity instruction was still harmless.

Relevant to this case, an individual can be guilty of third degree child assault through two alternative means: bodily harm to the child by means of a weapon or other instrument or thing likely to produce bodily harm *or* bodily harm to the child accompanied by substantial pain that extends for a period sufficient to cause considerable suffering. RCW 9A.36.140, .031(1)(d), (f). The State argues that for all alleged instances of Simeon's physical abuse of JC, except the car stabbing, the jury may have doubted whether an instrument Simeon used (like rice that JC was allegedly forced to kneel on) was likely to produce bodily harm or whether Simeon's acts caused JC substantial pain that produced considerable suffering.

However, the State argues that no juror could reasonably doubt that a knife is a weapon likely to produce bodily harm under the first alternative means of third degree child assault, and unanimity as to means was not required. And the State contends that there was no material difference in the evidence supporting all of the alleged instances of Simeon's assault against JC, including the car stabbing. Thus, if the jury believed that any of the alleged instances occurred, then it believed that they all occurred. And while the jury may have doubted whether some of the

alleged instances met the legal definition of third degree child assault, it could not have doubted that the car stabbing instance, which involved a weapon, constituted third degree child assault.

We disagree. We cannot rely on *Bobenhouse* to find harmlessness related to the instance involving the knife because there was conflicting testimony from JC about the car stabbing that distinguished it from other instances: at trial, JC did not initially remember any event occurring with Simeon in the car until she was prompted to recall her statement about this incident in a prior interview. Accordingly, we reverse Simeon's count of third degree child assault of JC. We note that this reversal could have been avoided had the State elected a specific instance *or* proposed a unanimity jury instruction.

6.      Count V: first degree child assault of AC

AC testified about many instances of significant physical abuse from Simeon, including Simeon beating AC with his fists and various objects, cutting AC with a knife leaving a scar on AC's back, and shooting a BB gun in AC's direction.

Because there were so many alleged instances of Simeon physically abusing AC, the State concedes that a rational juror could have had a reasonable doubt as to at least one of the alleged instances. Thus, the State's failure to specify an instance or propose a unanimity instruction was not harmless error under the applicable standard. Accordingly, we accept the State's concession and reverse this charge. We again note that this holding is required because of the combination of the State's decision to use very long charging periods, the State's failure to elect the specific

25

instance it was relying on for each charge in closing, and the State's failure to propose a unanimity instruction, which the State concedes was constitutional error.[8, 9]

B.      Specifying Means

Simeon argues that his animal cruelty conviction should be reversed because the trial court instructed jurors that they were not required to be unanimous as to Simeon's means of committing the offense.[10] Simeon acknowledges that in *State v. Armstrong*, 188 Wn.2d 333, 340, 394 P.3d 373 (2017), the Washington Supreme Court explicitly stated that a unanimity instruction is not required for alternative means crimes where both of the alternative means are supported by substantial evidence. However, Simeon argues that the holding in *Armstrong* is incorrect and should be revisited. Simeon does not argue that either alternative means for his animal cruelty conviction was not supported by substantial evidence.

In Washington, criminal defendants have a right to a unanimous jury verdict. WASH. CONST. art. I, § 21. "But in alternative means cases, where substantial evidence supports both

---

[8] We take this opportunity to note that where we reverse a conviction based on a unanimity error, we do not address whether the alleged instances of abuse actually occurred or whether the children's testimony is credible; those questions are for the factfinder.

[9] Simeon argues that his first degree child assault conviction involving AC (Count V) and third degree child assault conviction involving JC (Count IV) should be reversed because Wahl provided an improper opinion that AC and JC had been tortured. The State concedes that the conviction of child assault involving AC (Count V) must be reversed. And we reverse Simeon's conviction for third degree child assault of JC for lack of jury unanimity. Thus, because any alleged error would not impact Simeon's convictions, we need not address this issue.

Simeon also argues that the trial court's to-convict instructions for third degree child assault were erroneous. However, because we reverse Simeon's conviction for third degree child assault of JC based on lack of jury unanimity, we need not reach this issue either.

[10] Simeon also argues that his two child assault convictions should be reversed for this reason. Because we reverse both of those convictions for lack of jury unanimity, we need not address them here.

26

alternative means submitted to the jury, unanimity as to the means is not required." *Armstrong*, 188 Wn.2d at 340. An alternative means crime is one where the State may prove the proscribed criminal conduct in a variety of ways. *Id.*

Here, both parties agree that animal cruelty is an alternative means crime. Despite Simeon's arguments, we must follow the precedent the Supreme Court established in *Armstrong*— that a unanimity instruction requiring jurors to agree on the same alternative means by which the defendant committed the crime is not required where both alternative means are supported by substantial evidence. Given that Simeon does not argue that either alternative means for his second degree animal cruelty conviction was not supported by substantial evidence, we decline to reverse on this issue.

## II. ADMISSION OF RECORDINGS

A.      Admission of Recordings

Simeon argues that the trial court abused its discretion by admitting into evidence three recordings that KC made of Simeon and Margie that violated the "Washington Privacy Act," ch. 9.73 RCW, which requires two party consent to recording a conversation. The State argues that this error was unpreserved and we agree. The State further argues that even if admission of the recordings was error, it was harmless because the recordings were not inculpatory for Simeon.

RCW 9.73.030(1)(b) prohibits recording private conversations without first obtaining the consent of all parties to the conversation. Additionally, RCW 9.73.050 states that recordings in violation of RCW 9.73.030 are inadmissible in any civil or criminal case.

Simeon did not contend below that the recordings KC made of Simeon and Margie without their consent should be excluded because they violated Washington's two-party consent rule.

Thus, we need not address this issue unless admission of the recordings constituted manifest constitutional error. *See* RAP 2.5(a)(3). An error is manifest if the defendant can show that it had practical and identifiable consequences at trial. *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007).

Here, Simeon does not argue on appeal how admission of the recordings implicated his constitutional rights. Moreover, any error was not manifest because Simeon does not demonstrate that it had actual consequences with regard to his trial. Both Margie's attorney and the trial court noted that the recordings might have been helpful for the defense because they painted Margie and Simeon as "just nagging parents" instead of physically abusive parents. 3 VRP at 1252. And Simeon's attorney noted that on the single recording involving Simeon, there were "no threats made there, so I don't see it relevant to the case." 3 VRP at 1253. Because Simeon's own attorney acknowledged that the single recording of Simeon did not include any threats or sounds of violence, this evidence did not impact the outcome of his trial. And although Simeon asserts we should exercise our discretion and address this issue anyway, we decline given that the recordings were not prejudicial to Simeon. Thus, we decline to address this argument.

B.      Ineffective Assistance of Counsel

Simeon argues that he received ineffective assistance of counsel because his defense counsel did not object to admission of the recordings at trial.

For an ineffective assistance of counsel claim, the defendant must demonstrate both that their counsel's performance at trial was deficient, and that this deficiency had a prejudicial effect. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been

different had defense counsel not performed deficiently. *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017). Because the defendant must show both deficiency and prejudice, a failure to demonstrate either prong will end our inquiry. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

For the same reasons we determined that the admission of the recordings was not manifest above, Simeon cannot demonstrate prejudice. Thus, we conclude that Simeon did not receive ineffective assistance of counsel.[11]

### III. JURY INSTRUCTIONS

#### A.    Animal Cruelty Instruction

Simeon argues that the jury instructions for second degree animal cruelty omitted an essential element of the charge: that Simeon owned Pepper, the animal in question. Simeon argues that this was not harmless error because his ownership of Pepper was not supported by

---

[11] In her briefing, Margie argues that her defense counsel was ineffective for failing to object to two of the State's comments in its closing argument: (1) that Simeon's and Margie's testimony "might be very convenient" in response to the other evidence presented at trial, and (2) that Margie's testimony about donating a doll with which she allegedly hit AC was "convenient" after she heard the children's testimony. 6 VRP at 2639, 2702; *see* Br. of Appellant at 30-32 (No. 58746-7). Margie argues that these were impermissible, "generic tailoring" claims that Margie had tailored her testimony to combat the evidence against her. Br. of Appellant at 32 (No. 58746-7).

Simeon adopts all of Margie's arguments on appeal. However, the testimony regarding the doll was specifically relevant to an alleged instance where *Margie* hit AC with the doll, so we need not address that issue in this case. Additionally, we need not decide whether the State's remaining comment was an improper allegation of tailoring because it was not prejudicial. *See Estes*, 188 Wn.2d at 457-58 (stating that for an ineffective assistance of counsel claim, the defendant must demonstrate deficient performance *and* prejudice). The State's single comment that Simeon's testimony "might be very convenient" is insignificant when compared with the evidence that the State cited in its entire closing arguments, including extensive testimony from the children, police, medical examiners, and forensic interviewers. 6 VRP at 2639. Thus, Simeon has not demonstrated prejudice, and reversal is not required based on alleged tailoring.

uncontroverted evidence. The State concedes that this was error but argues that it was harmless. We agree with the State.

We review to-convict jury instructions de novo. *State v. Jallow*, 16 Wn. App. 2d 625, 634, 482 P.3d 959 (2021). "A to-convict instruction must contain all of the essential elements of the crime because it serves as [a] 'yardstick' for the jury to measure innocence or guilt." *Id.* (quoting *State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997)). Omission of an essential element from a jury instruction "is of sufficient constitutional magnitude to warrant review when raised for the first time on appeal." *State v. Mills*, 154 Wn.2d 1, 6, 109 P.3d 415 (2005). Such an error is harmless only if "'the reviewing court is convinced beyond a reasonable doubt any reasonable jury would reach the same result absent the error.'" *State v. Richardson*, 12 Wn. App. 2d 657, 667, 459 P.3d 330 (2020) (internal quotation marks omitted) (quoting *State v. Chino*, 117 Wn. App. 531, 538, 72 P.3d 256 (2003)).

In this case, the trial court instructed the jury that an individual is guilty of second degree animal cruelty if they either knowingly, recklessly, or with criminal negligence inflict "unnecessary suffering or pain upon an animal" *or* if they fail "to provide necessary shelter, rest, sanitation, space, or medical attention for the animal and as a result the animal suffered substantial and unjustifiable physical pain." CP at 64. Former RCW 16.52.207(2) (2020),[12] the second degree

---

[12] RCW 16.52.207(2) was recently amended in 2025 to include language expanding ownership to also include those "in possession or control of, residing with, or who has accepted responsibility for, an animal." LAWS OF 2025, ch. 220 § 6. However, generally "a defendant's sentence is determined based on the law in effect at the time the defendant committed the crime for which [they are] being sentenced." *State v. Jenks*, 12 Wn. App. 2d 588, 592, 459 P.3d 389 (2020). Because the language requiring simply "ownership" was in effect during the charging period for Simeon's second degree animal cruelty count against Pepper, we do not apply the 2025 amended language.

animal cruelty statute, states that for this second alternative means, the individual must be the owner of the animal. Both parties agree that this ownership requirement was not included in the animal cruelty jury instructions—which the State proposed—and that this omission was an error.

However, we agree with the State that this error was harmless because no reasonable juror could have doubted Simeon's ownership of Pepper from the evidence at trial. At trial, when asked if she had pets, Margie replied, "Yes. . . . Our last pets were Pepper and Misty." 6VRP at 2351-52. MR also testified that the Cruzes had an old white dog when she lived with them. Margie further testified, "Pepper was adopted. He came to us - well, we purchased him through Petco." 6 VRP at 2352. Margie also stated that she and Simeon would feed Pepper.

Simeon argues that there is a dispute about whether Pepper was actually ZC's dog. But ZC was the Cruzes' child at the time, and there is no dispute that Simeon and Margie were the adults in the family ultimately responsible for the dog. Margie even explained that Pepper "was everybody's dog, but we purchased it for [ZC], so we used to say that it was [ZC's] dog." 6 VRP at 2432.

Based on the uncontroverted evidence that Margie and Simeon, a married couple, purchased Pepper as a pet for the family and assumed care of him, no reasonable juror could have doubted that Simeon was one of Pepper's owners. Thus, the error omitting the ownership element from the second degree animal cruelty instruction was harmless beyond a reasonable doubt and does not require reversal.

B.    Other Arguments

Simeon challenges several other jury instructions on appeal.

If an appellant challenges a jury instruction, we review the instruction de novo and consider the challenged instruction within the context of the other instructions. *State v. Bennett*, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). "'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.'" *Keller v. City of Spokane*, 146 Wn.2d 237, 249, 44 P.3d 845 (2002) (quoting *Bodin v. City of Stanwood*, 130 Wn.2d 726, 732, 927 P.2d 240 (1996) (plurality opinion)). An error in the jury instructions is harmless if, beyond a reasonable doubt, the jury's verdict would have been the same absent the error. *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889 (2002).

1.    Acquittal standard

Simeon argues that in all the to-convict jury instructions, the trial court erroneously required a different standard for acquittal than for conviction. Specifically, the trial court stated that the jurors could acquit after they weighed "all the evidence." *See* CP at 31-33, 35-37, 43-45, 57-59, 65-66. However, the trial court instructed the jury that it only needed to decide "from the evidence" that the State had met its burden in order to convict. *Id.* Simeon contends that a reasonable juror could believe based on these instructions that conviction was permissible after a less stringent review of the evidence than was required to acquit. Simeon also argues that the trial court erroneously stated that the jury could only acquit by considering *all* of the evidence.

Defense counsel did not object to this jury instruction below, so we first determine whether the issue amounts to manifest constitutional error. *See* RAP 2.5(a)(3). Here, a reasonable juror would have been informed about the appropriate acquittal standard. The language Simeon

challenges is standard for many to-convict jury instructions. *See, e.g.*, WPIC 44.11 (first degree child rape). There is no meaningful or substantive distinction between deciding "from the evidence" and "weighing all the evidence." And Simeon does not cite any cases where the courts took issue with this standard phrasing. Thus, this was not a misstatement of the law and is therefore not a constitutional issue that is reviewable for the first time on appeal.

2.  Verdict forms

Simeon argues that the trial court erred by inconsistently instructing the jury about the verdict forms. Throughout the relevant instruction informing the jury how to fill out the verdict forms, the trial court stated multiple times: "If you cannot agree on a verdict, do not fill in the blank provided." CP at 76. Following the standard pattern jury instructions, the court ended by saying, "*When* all of you have so agreed, fill in the verdict forms to express your decision." CP at 77 (emphasis added); *see* WPIC 151.00. Simeon argues that this inconsistency presumes jurors would reach a verdict.

Defense counsel objected to the use of the word "when" in this instruction, so we review the jury instruction de novo. However, there is strong evidence in the record that even if this language was error, something we need not decide, it was harmless. The jury submitted an inquiry to the trial court during deliberations stating, "the jury is unable to come to a verdict on Form V," which was the verdict form for second degree animal cruelty against Misty—a charge that was later dismissed. CP at 116 (No. 58746-7). The trial court responded, "If you are unable to reach a decision, leave the verdict form blank." *Id.* (capitalization omitted).

Thus, even if the use of the word "when" in the instruction was misleading, which we doubt given its conformity with the standard pattern jury instructions and the extensive other instructions

informing the jurors to leave the verdict forms blank for undecided counts and not to "change [their minds] just for the purpose of reaching a verdict," the trial court explicitly informed the jurors that they should leave a verdict form blank if they could not reach a decision. CP at 18. Because Simeon was not prejudiced by this jury instruction, any alleged error was harmless and we decline to reverse on this issue.

C.      Double Jeopardy

The State charged and tried Simeon for first degree child assault of JC in Count IV. However, the jury only convicted on third degree child assault of JC. Simeon thus argues that double jeopardy prevents retrial on first degree and second degree child assault of JC.

Under the Fifth Amendment to the United States Constitution, a defendant cannot be tried again for a particular crime if they have already been acquitted of that crime. *State v. Glasmann*, 183 Wn.2d 117, 121, 349 P.3d 829 (2015). "However, silence does not terminate jeopardy when the record indicates that the jury failed to agree on a verdict." *Id.* at 121-22. In other words, "if the State charges a person with greater and lesser offenses and the jury is unable to agree regarding the greater offense, the State may retry the defendant for the greater offense without violating double jeopardy." *Id.* at 127. If the trial court instructs the jurors that they should leave the verdict form for the greater offense blank if they cannot agree on a verdict and instead consider the lesser offense, a blank verdict form for the greater offense does not trigger double jeopardy. *Id.* at 122-24.

Here, for all the child assault charges, the trial court instructed the jury, both verbally and on the written jury forms, that for the greater offenses, "If you unanimously agree on a verdict, you must fill in the blank provided in [the] verdict form . . . the words 'not guilty' or the word

'guilty,' according to the decision you reach. If you cannot agree on a verdict, do not fill in the blank provided in [the] verdict form." CP at 76. And the jury left the verdict forms for first and second degree child assault of JC blank. Because the trial court explicitly instructed the jury to leave the greater offense verdict forms blank only if they could not agree on a verdict, double jeopardy does not prohibit the State from retrying Simeon on any greater offenses for child assault of JC.

### IV. COMMUNITY CUSTODY CONDITIONS

Simeon challenges three of his community custody conditions. The State argues that the challenged community custody conditions are not ripe for review and, alternatively, that they are constitutionally valid.

"Preenforcement challenges to community custody conditions are ripe for review when the issue raised is primarily legal, further factual development is not required, and the challenged action is final." *State v. McWilliams*, 177 Wn. App. 139, 153, 311 P.3d 584 (2013). We also consider the hardship imposed on the petitioner if the condition challenged is not reviewed on appeal. *State v. Cates*, 183 Wn.2d 531, 534, 354 P.3d 832 (2015). A condition that is ripe for review is unconstitutionally vague "if it either fails to give fair warning of what is forbidden or fails to give ascertainable standards that will prevent arbitrary enforcement." *State v. Johnson*, 197 Wn.2d 740, 747, 487 P.3d 893 (2021).

"Sentencing courts have the power to delegate some aspects of community placement" to the Department of Corrections. *State v. Sansone*, 127 Wn. App. 630, 642, 111 P.3d 1251 (2005). However, trial courts "'may not wholesaledly abdicate . . . judicial responsibility'" for setting community custody conditions. *Id.* (internal quotation marks omitted) (quoting *United States v.*

*Loy*, 237 F.3d 251, 266 (3rd Cir. 2001)). In other words, a trial court cannot give a probation officer "'an unfettered power of interpretation'" over a community custody condition. *Id.* (quoting *Loy*, 237 F.3d at 266).

A.     Geographic Boundaries

Simeon first challenges the community custody condition that he must "[r]emain within geographic boundary" set by the Department in writing. CP at 98. He contends that this condition is unconstitutionally vague. We disagree.

Here, the trial court did not impose a specific geographic boundary. Instead, it clearly and unambiguously required Simeon to comply with a boundary to be set by the Department. Under RCW 9.94A.703(1)(b), the sentencing court must require the defendant "to comply with any conditions imposed by [the Department] under RCW 9.94A.704." And the legislature *requires* the Department to set geographic restrictions for individuals it supervises based on an assessment of the individual's risk to community safety. RCW 9.94A.704(2)(a), (3)(b). Thus, given that the legislature granted the Department the authority to impose these geographic boundaries and provided guidelines for deciding how to impose them, the trial court did not improperly give the Department an unfettered power of interpretation. *See State v. Lundstrom*, __ Wn. App. 2d __, 572 P.3d 1243, 1245-46 (2025). Additionally, this community custody condition contemplates that the defendant will have sufficient notice of what the geographic boundaries are and this clarity also protects against arbitrary enforcement. Finally, the defendant can seek administrative review of the geographic boundaries that the Department sets. *Id.* Accordingly, the condition is not unconstitutionally vague.

B.        <u>Loitering in Places Where Children Congregate</u>

Simeon next challenges the community custody condition barring him from loitering in places where children congregate like parks, video arcades, and shopping malls. He contends that the term "loitering" is unconstitutionally vague.

The State cites *State v. Martinez*, 85 Wn.2d 671, 538 P.2d 521 (1975), *overruled in part on other grounds by State v. Smith*, 93 Wn.2d 329, 610 P.2d 869 (1980), for the conclusion that this community custody condition sufficiently establishes the people prohibited from loitering and the places where those people cannot loiter such that it is not impermissibly vague. *Martinez* analyzed a statute that prohibited all people, except students, parents, and employees of a school, from "[willfully] loiter[ing]" around schools "without a lawful purpose." *Id.* at 673. The Washington Supreme Court stated that "a statute [that] simply proscribes 'loitering' is impermissibly vague because the word loiter standing alone does not necessarily connote sinister or illegal activity and, thus, the ordinary citizen will be uninformed as to what types of behavior will and will not be subject to criminal prosecution." *Id.* at 675. The court concluded that although the statute outlined the prohibited place of loitering and class of people prohibited from loitering, it did not sufficiently define what actions would qualify as loitering. *Id.* at 676. The court thus held that the statute was void for vagueness because it did not "adequately apprise an ordinary citizen of the types of behavior prohibited." *Id.* at 677.

Several cases address whether a community custody condition prohibiting a defendant from frequenting or loitering in places where children tend to congregate is unconstitutionally vague. *See, e.g.*, *State v. Wallmuller*, 194 Wn.2d 234, 245, 449 P.3d 619 (2019). While in those cases defendants have mostly challenged the phrase "places where children congregate,"

Washington courts have repeatedly held that this kind of condition is not vague if it provides a nonexclusive list of places envisioned by the condition. *Id.*

The dictionary defines "loitering" as "to remain in or near a place in an idle or apparently idle manner" or to "hang around aimlessly." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1331 (2002). This definition is consistent with a common sense understanding of the word in this context where, unlike in *Martinez,* it is used to limit a sex offender's contact with potential victims in connection with a list of places where children tend to be. The class of people prohibited from loitering is very narrowly defined, as the condition in this judgment and sentence only applies to Simeon. And the places where Simeon is prohibited from loitering are also sufficiently specific. *See Wallmuller*, 194 Wn.2d at 245. We hold that while the particular actions constituting loitering are not specifically defined in the condition, a person of common intelligence can understand its meaning in this context and the condition is not unconstitutionally vague.

C.      Home Visits and Visual Inspection

Finally, Simeon challenges the community custody condition that requires him to submit to home visits and visual inspections by the Department. Simeon argues that the condition unconstitutionally allows searches without reasonable cause. The State argues that a pre-enforcement challenge to this condition is not ripe for review. We agree with the State.

In *State v. Cates*, the Washington Supreme Court considered whether a pre-enforcement challenge to the following condition was ripe for review:

> "You must consent to [Department of Corrections] home visits to monitor your compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence in which you live or have exclusive/joint control/access, to also include computers which you have access to."

183 Wn.2d at 533 (alteration in original) (quoting record).

38

While the court concluded that this was a final action and that Cates raised primarily legal issues, it noted that further factual development was required, commenting, "[s]ome future misapplication of the community custody condition might violate article I, section 7, but that 'depends on the particular circumstances of the attempted enforcement.'" *Id.* at 535 (quoting *State v. Sanchez Valencia*, 169 Wn.2d 782, 789, 239 P.3d 1059 (2010)). The court also concluded that the risk of hardship to Cates was insufficient to justify review before the challenge was factually developed because "[c]ompliance here does not require Cates to do, or refrain from doing, anything upon his release until the State requests and conducts a home visit." *Id.* at 536. Accordingly, the court held that Cates' pre-enforcement challenge was not ripe. *Id.* Recently, in *State v. Nelson*, the Washington Supreme Court reiterated the holding in *Cates* when addressing when a challenge to a community custody condition is ripe. ___ Wn.3d ___, 565 P.3d 906, 912-14 (2025).

Here, Simeon challenges a community custody condition almost identical to the one at issue in *Cates*. While we agree that this is a final action and that the challenge raises primarily legal issues, Simeon's claim requires further factual development as did the claim in *Cates*, and the Washington Supreme Court recently relied on *Cates* in *Nelson*. Further, the risk of hardship to Simeon is insufficient to justify review before it is factually developed because Simeon is not required to do or refrain from doing anything upon his release until the State seeks to conduct a home visit. Accordingly, we conclude that Simeon's challenge to this community custody condition is not ripe for review.[13]

---

[13] In his assignments of error, Simeon mentions two clerical errors in his judgment and sentence. However, because he does not address them in the text of his argument, we need not reach them on appeal. *See* RAP 10.3(a)(6); *Riley v. Iron Gate Self Storage*, 198 Wn. App. 692, 713, 395 P.3d 1059 (2017).

CONCLUSION

We reverse Count IV (third degree child assault of JC), and Count V (first degree child assault of AC) and remand these counts for a new trial. We affirm Count I (first degree child rape of JC), Count II (first degree child rape of KC), Count III (first degree child rape of MR), and Count VII (second degree animal cruelty) and remand them for resentencing in accordance with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

PRICE, J.

CHE, J.